THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DEEARLISE CHILDROUS, Defendant-Appellant.

Fourth District No. 4—88—0796

Opinion filed March 28, 1990.

40

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Following a jury trial, defendant Deearlise Childrous was found guilty of murder and armed robbery and sentenced to natural life and 30 years' imprisonment. Defendant raises the following issues for our consideration: (1) whether the trial court's refusal to bar the admission into evidence of statements of defendant's accomplice, Tommy Coleman, and the prosecutor's highlighting of these statements during closing arguments, without any limiting instruction, denied defendant a fair trial; (2) whether the jury instructions for armed robbery were deficient; and (3) whether the victim-impact statement included as a part of the presentence report violated defendant's rights under the eighth amendment of the United States Constitution and article I, section 11, of the Illinois Constitution. We affirm.

On June 2, 1988, a five-count information was filed, charging defendant Deearlise Childrous and Tommy Coleman with four counts of first degree murder and one count of armed robbery. The informa-

tion alleged that on April 8, 1988, defendant and Coleman fatally shot Beth Akers after stealing her purse. Defendant and Coleman were tried separately. Defendant's jury trial began on September 27, 1988.

## I. REVIEW OF THE EVIDENCE

### A. STATE'S CASE

#### (1) DISCOVERY OF VICTIM AND POLICE ACTIVITY

Tracy Hamilton testified that on April 8, 1988, she lived at 726 North Seventh Street in Springfield. She had known 20-year-old Beth Akers for four years, and was a roommate of Akers' boyfriend, Todd Nutt. On April 8, Akers arrived at Hamilton's house at approximately 11:15 p.m. and left about 15 minutes later. When Akers left, Hamilton noticed she was carrying her purse and keys and was wearing her eyeglasses. Hamilton expected Akers to return in about 15 minutes. At approximately 11:45 p.m., Hamilton testified after she heard a scream and then two shots, she walked to the front door of her house to investigate. Hamilton testified she then heard Akers scream, "Tracy." When Hamilton went outside, she found Akers on the sidewalk near a neighbor's house. Hamilton initially saw no one else in the area.

Hamilton testified she then approached Akers and asked her what happened, and Akers said, "[T]hey stole my purse." Hamilton then went back inside her house, called the police, and came back outside to be with Akers. Hamilton testified Akers got up slowly and took five limping steps before falling face first into Hamilton's yard. Hamilton testified she then saw four young black males, approximately 8 to 13 years old, walk by without stopping or offering help. Hamilton stated the area was "bright" and "always lit up." Hamilton did not see Akers' purse near her, but did see that her keys were in her hand and she had her eyeglasses on.

Springfield police officer Robert Crouch testified that he was called to the 700 block of North Seventh Street in Springfield at approximately 11:45 p.m. on April 8, 1988. Upon arriving at 726 North Seventh Street, Crouch and his partner found Akers lying on the sidewalk in front of that address. Akers was conscious at that time, and mumbled something to Officer Crouch which he testified was unintelligible. Crouch did not observe any injuries at first and called an ambulance.

Roy Mayfield was the ambulance paramedic who initially treated Akers at the scene on North Seventh Street and then transported her

to St. John's Hospital. Upon his arrival, Mayfield testified Akers was in "full arrest," but was revived with CPR procedures. Mayfield noticed a small bullet wound in Akers' abdominal region.

Dr. Robert Grover testified he performed the autopsy on Beth Akers on April 9, 1988. Akers had been pronounced dead at 1:37 a.m. on April 9, after unsuccessful surgery. Akers' body displayed gunshot wounds to the abdomen, right thigh, and the backside of the right knee. Dr. Grover found and removed a bullet from the lower vertebrae region of Akers' body. The doctor identified in court the bullet that he removed from Akers. Officer John Adleman attended the autopsy of Beth Akers. He observed Dr. Grover pull a spent bullet out of the lower spinal area. In court, Adleman identified the same bullet.

A set of car keys, a pair of prescription eyeglasses and a piece of blue nylon cloth were found in the vicinity of 726 North Seventh Street in the early morning of April 9, 1988.

### (2) EVIDENCE RE STATEMENTS ATTRIBUTED TO TOMMY COLEMAN

Jeff Kimble, a convicted residential burglar, testified that on April 8, 1988, he lived with the defendant and the defendant's aunt, Jackie Danley, who was Kimble's girlfriend. Kimble testified he had been friends with the defendant for seven or eight years and had been friends with Coleman for two or three months. On April 8, 1988, Kimble was at home watching television with Danley, the defendant, and Coleman. Kimble stated defendant and Coleman arrived at the house at "11 or 9 *** I ain't quite sure" and began to talk about "going to get some money." Kimble stated defendant and Coleman left the house on April 8 at approximately 10 p.m. and indicated that they were going to do a "robbery or take a purse." Defendant and Coleman returned 1 to 1½ hours later, and had a purse with them, the contents of which were emptied onto the kitchen table in Kimble's house. Kimble stated Coleman took credit cards, which had Beth Akers' name on them, and a wedding band; he (Kimble) took an ink pen; and the defendant took nothing from the purse.

After Coleman and the defendant returned to the house, Kimble testified Coleman reported that "they had snatched the purse and Tommy said that him and Deearlise had shot the woman because she wouldn't let go of the purse."

Kimble admitted while testifying that when he first spoke with the police, he told them in writing that he was told that Coleman, not the defendant, had done the shooting. Kimble stated he lied to the police because he was dating the defendant's aunt. Kimble again reiterated his testimony that Coleman told him that the defendant was the

shooter because "she wouldn't let go of the purse and so Deearlise shot in the air once and then he said he shot her." Kimble stated he changed his story to implicate the defendant only after the police told Kimble that they did not believe his story about Coleman being the shooter.

After the April 8 conversation, Kimble testified that Coleman then went across the street, threw Akers' purse into a dumpster, and unsuccessfully attempted to get rid of the checks and credit cards in the purse.

Kimble testified further regarding the events of April 9, 1988, at defendant's mother's house. Kimble stated that on April 9 he read something in the newspaper about the Akers murder and then threw the paper to the defendant, who in turn threw the paper to Coleman. Kimble testified the following conversation then occurred between Coleman and the defendant:

"[By Kimble:] Tommy said that Deearlise had shot and killed a lady but he said well, if you wouldn't never had snatched the purse I wouldn't never have to shoot her ***."

Kimble further testified that Coleman was at his house on April 10, 1988. Kimble testified as follows:

"Q. [By Prosecutor:] Okay. Did Tommy say anything about this case?

A. [By Kimble:] Yeah, he had told me that DeeArlise had shot this woman and took the purse again. He had told me this.

Q. Okay. Did he ever mention anything about his clothing?
***

A. Yeah, Tommy said that his jacket was tore [sic] and that she had like some of his skin and so he burned the jacket up ***.

Q. Did he indicate why he burned the jacket?
* * *

A. It was torn and the police had like some of his skin in the cloth off the jacket.

Q. Did he indicate what color jacket it was?

A. It was a blue windbreaker."

Kimble further testified he was at the home of Theodis Williams on April 11, 1988, with Coleman and a third person, Mark Johnson. Kimble testified Coleman had a gun on the couch which Coleman stated had been used in a murder. Kimble described the gun as a .22 caliber, with a white handle and a holster. Kimble identified the gun in court, represented as People's exhibit No. 16, as the same gun he saw on April 11 at Williams' house. Kimble testified that on April 15,

1988, Coleman and the defendant told him they sold the gun to a girl named "Mopey."

Cammona "Mopey" Gailes, an admitted prostitute for six years with a prior retail-theft conviction, testified about the purchase of a handgun from Coleman and the defendant. This purchase was made with the assistance of the Springfield police department. Mopey testified she had known the defendant for five or six years, and had known Coleman for a few months. On April 13, 1988, at 11:30 p.m., Mopey stated she was "working" a Springfield street corner when she flagged down Detective Tom Murphy and told him she knew something about the Akers murder. Mopey stated she used marijuana prior to this meeting. Murphy took Mopey to the police station, where she gave a statement. Mopey stated she told Murphy she knew where to get the gun used in the murder, and Murphy gave her $70 to buy the gun. Mopey stated she went to the home of Jackie Danley, where she found the defendant lying on the couch. Mopey asked him where she could get a gun "like a small .22." Mopey stated the defendant told her to come back later. Mopey stated she went back to the house at 9:30 a.m. on April 14, and then again at 10:30 a.m., when she and the defendant went to Coleman's house. Mopey stated she gave the money to the defendant and received the gun from Coleman. Mopey stated Coleman said, "[W]hatever [you] do, don't get caught with the gun," and started laughing. Mopey identified People's exhibit No. 16 as the same gun she purchased from Coleman and the defendant.

Mopey testified she again met with Coleman and the defendant on April 28, 1988, at 11 p.m. Mopey testified as follows:

> "Yes, they asked me about if I knew anybody that would be interested in cashing some checks, like a white female about the ages of twenty or twenty-one. *** After that, a few hours later I seen them over in the John Hay Homes over by Jackie Bland's house *** DeeArlise said that Mopey, I heard you know something about Tommy and I supposed to have killed the white girl. I asked them who shot her and he started laughing and didn't say, asked me if I still had the gun and would I be willing to sell it back to them ***."

Springfield detective Tom Murphy testified about the meeting with Mopey on April 13, 1988. He stated he gave Mopey $70 to buy a gun and stated he received a .22 caliber handgun from Mopey on April 14. Murphy identified People's exhibit No. 16 as the same handgun. Murphy stated he arrested the defendant on May 3, 1988. Murphy stated the defendant became "agitated and nervous" when Murphy showed the defendant the gun that Murphy had obtained from Mopey.

Murphy stated he did not believe that Mopey was under the influence of drugs or alcohol when he met with her on April 13 and 14, 1988. Further, she was not promised anything in exchange for her cooperation. Mopey had no cases pending against her when she helped with the purchase of the gun, but did have pending cases at the time of the defendant's trial.

### (3) FORENSIC EVIDENCE

Kevin Horath, a State of Illinois forensic scientist specializing in fingerprint identification, testified that he examined People's exhibit No. 16, the gun and holster, for latent fingerprints, and that he found no suitable latent fingerprints on either item. Michael Kreiser, a State of Illinois forensic scientist, testified he examined and compared People's exhibit No. 12A, a mutilated bullet taken from Akers' body, and People's exhibit No. 16. Kreiser testified that the bullet "could not be identified or eliminated" as having been fired from the handgun. Kreiser testified the bullet's mutilated condition contributed to the difficulty in the identification process. Kreiser stated the rifling characteristics of the bullet and the gun were similar, but were so common that the bullet could have come from any one of "thousands, if not millions" of other guns. Kreiser also noted that the gun contained three live cartridges, and two spent cartridges, as well as one empty chamber.

### (4) EVIDENCE RE OUT-OF-COURT STATEMENTS ATTRIBUTED TO THE DEFENDANT

The State presented the testimony of six persons who had conversations with the defendant while he was incarcerated at the Sangamon County jail prior to his trial in this case, from May 1988 to August 1988.

Alfred "Gus" Dawson testified he was in Sangamon County jail with the defendant in July and August 1988. Dawson testified the defendant told him that if Coleman had not made any statements against him, "The State wouldn't have a case to bring him to trial," and that "maybe if Tommy hadn't sold her (Mopey) the gun *** they wouldn't be in jail." Dawson further testified that after he called the defendant "a pistol-packing, purse snatching punk," the defendant got mad and said "he wished he'd have shot me instead of her." Dawson stated the defendant did not specify who "her" was. Dawson stated he recalled visiting the defendant's house "maybe" on April 8, 1988, when the defendant showed Dawson the gun introduced as People's exhibit No. 16. Dawson testified the jailhouse conversations took

place in August 1988. Dawson admitted having two burglary convictions and a retail-theft conviction.

Scott Sheppard testified he had a conversation with the defendant at the end of May 1988, when both were in the county jail. Sheppard testified the defendant told him the following:

> "[Defendant] said that on the night that the lady had got shot him and Tommy Coleman had been up on North Seventh Street looking for a hustle and that they had seen a lady with a purse and he had told Tommy to snatch the purse from the lady. Tommy snatched the purse from the lady but he couldn't get it from her. She was struggling and making a big scene and that he had to help Tommy get the purse from her and she tried to grab him. He said I wasn't going to let the bitch grab me so I had to ice her ass."

Sheppard stated the defendant told him he tried to shoot the woman in the head, but shot her somewhere below the breast. Sheppard said defendant told him he shot twice but was unsure where the second bullet struck the woman. The defendant further told Sheppard about returning to "the projects" with the purse, emptying the contents, and disposing of the purse in the dumpster. Sheppard stated the defendant told him he wore his long trench coat or gangster coat on the night of the shooting because he could conceal a gun in the coat. Sheppard stated the defendant described the gun as a .22 caliber with a long barrel and white handle. Defendant told Sheppard he and Coleman sold the gun to a prostitute named Mopey. Defendant told Sheppard he received the money from Mopey and Coleman gave her the gun.

John Roth testified he had a conversation with the defendant in the county jail in late July 1988 during which, in response to questioning by Roth, the defendant said he had been arrested for shooting a girl, and the shooting had occurred after he and a buddy tried to steal a girl's purse. According to Roth, the defendant further told him that they shot her because, when they went to take off running, he was scared and then turned and fired. Defendant told Roth he shot her twice and she died because one of the bullets must have hit a main artery. Roth was previously convicted of obstruction of justice and driving with a revoked license. Roth testified he reported the conversation with the defendant to the State's Attorney after he was released from jail, having pleaded guilty to the charges of obstruction of justice and driving with a revoked license.

Willie Fisher testified he had a conversation with the defendant on May 29, 1988, in the county jail. Fisher testified as follows regard-

ing what the defendant told him on May 29:

"A. Well, [defendant] discussed the fact that \*\*\* he had been in possession of a pistol and that the Akers girl had been shot, that she was shot twice and that they were trying to snatch her purse.
\*\*\*

A. \*\*\* [H]e had a guy with him named Coleman and they had left and went down to St. John's at first, went down through the parking lot down there to check things out and there wasn't nobody down there to take care of what they wanted to do so they left and went up on Seventh Street.
\*\*\*

A. [Defendant] [s]aid they was trying to make some money.
\* \* \*

A. [They saw] Miss Akers walking south—coming this way towards the hospital.
\*\*\*

A. Mr. Coleman [grabbed the purse].
\*\*\*

A. He [defendant] said that the girl screamed and he [defendant] shot her once and she still had hold of her purse and fell to the ground and screamed again and said Coleman had pulled the purse out of her hand and when she screamed the second time he [defendant] fired another shot.
\*\*\*

A. [They went] [b]ack to the projects.
\*\*\*

A. \*\*\* First time he said there was a hundred and fifty dollars. Then one time he told me there was two hundred and eighty dollars.
\*\*\*

A. [They used] a 22 caliber.
\*\*\*

A. \*\*\* [H]e said they had sold it to—I don't know her real name, but Mopey."

Fisher had three misdemeanor theft convictions and at the time of trial had a case pending for unlawful use of weapons. On cross-examination, Fisher confirmed he was convicted of aggravated kidnapping in 1985. Fisher testified he was released on bond for the pending charges a few days after he told the Springfield police of his conversation with the defendant.

Titus White, who has a prior burglary conviction and who was in

jail at the time of this trial for another burglary, testified he had a half-hour conversation with the defendant on August 20 or August 21, 1988, while in the county jail. This conversation occurred after the conviction of codefendant Coleman. There were 20 to 25 other prisoners around, but White stated none of them heard the conversation. White testified as follows regarding the statements made to him by the defendant:

> "A. [Defendant] said, man, he said, he said I'm not on this shit that Tommy about, he said—he said Tommy went downstairs with that bullshit. If Tommy would have went downstairs like I told him to, then, you know, he wouldn't have had the problems that he had. *** I'm going to beat this ***.
>
> * * *
>
> A. Oh, well, he told me, he said that Tommy didn't have to go down there *** talking about the girl was going to give me the purse *** I didn't have to shoot her *** because *** she would have let the pocketbook go.
>
> . * * *
>
> A. Well, after we talked about it, you know, I knew that it was a serious case because it's murder, you know, and I asked him, I said DeeArlise, man, I said, did you shoot the girl.
> ***
>
> A. *** [H]e said, oh, Titus, man, he said I shot the bitch but Tommy didn't have to go *** telling them people ***."

White testified the defendant told him the girl's name was Beth Akers. White also testified the defendant told him the gun was "a .22 long" and that he (White) had not known what type of gun was used before the defendant told him the type. White testified he heard about the April 8 shooting in the projects.

Armin Bredemeyer testified he was in the county jail at the time of the defendant's trial on charges of criminal damage to property and he had a prior conviction for residential burglary. Bredemeyer testified he overheard a conversation in the county jail on August 15, 1988, between Coleman and the defendant where the defendant talked to Coleman about "recanting his story that he previously gave and that if he didn't, certain things could happen to him or his family." Bredemeyer also testified he overheard inmate Dawson tease and upset the defendant in late July 1988, which caused the defendant to state "I wish I hadn't shot that bitch, I wish I would have shot you instead ***." Bredemeyer testified he overheard the defendant tell someone else in an August 1988 jailhouse conversation that "he didn't mean to shoot the girl, that he turned around and the girl saw his

face and he panicked and he fired two shots and he ran."

The State also presented the testimony of Rodney White, who testified he had a conversation with the defendant on April 9 or April 10, 1988, in the parking lot in the John Hay Homes. Rodney stated the defendant told him that he (the defendant) and Coleman had gone out the night before to make some money; that they had run across a young white woman; Coleman snatched her purse; and the defendant had fired a shot during a tug-of-war over the purse. Rodney testified the defendant told him "the bitch wouldn't let go of the purse so he shot the bitch and then they took off running." According to Rodney, the defendant stated that "they were out on the hustle." The defendant told Rodney that he and Coleman were on North Seventh Street, and that they had approached Akers as she got out of her car. Rodney testified the defendant told him Coleman was the one who grabbed the purse and the defendant was the one who shot her two times. The defendant told Rodney he took $150 from Akers' purse.

Rodney testified he and the defendant then went to Jackie Danley's house on April 10 at 10 a.m., where defendant showed Rodney several guns, including a "long .22," which defendant told Rodney was dirty. Rodney identified People's exhibit No. 16 as the same gun defendant showed him on April 10, 1988. Rodney testified, "I think [the defendant] told me, he said this is the gun I shot that white bitch with."

### B. DEFENDANT'S CASE

Defendant presented several witnesses. William Lee, of 850 North Seventh Street, Springfield, testified that on April 8, he was inside his house when his wife came in and said that she heard two gunshots and a scream. Lee testified that he and his wife, along with Tommy Horrighs and a woman named Rosey, walked to within 60 feet of where the girl was lying. Lee stated he observed seven or eight black males heading down the street, and then turning down a side street. Lee stated he was not close enough to identify any of these people, but could tell they were all 17 to 20 years old. Lee stated they were in between the body of the victim and Mr. Lee himself. Lee recalled that the area was poorly lit. When he first saw the men, Lee testified they were very close to the victim's body.

Thomas Horrighs was with William Lee on April 8, 1988, when he and Lee heard some shots. Horrighs testified he and Lee and some other people walked down toward the area where the body was lying and saw seven to nine black males come out from in between some houses. The men in this group were ages 15 to 19 years old. Hor-

righs, too, believed the lighting in the area was not very good. Horrighs did not see these black males real close to the body. Horrighs testified he thought the shooting occurred at 7 p.m. or 8 p.m. on April 8.

Margo Nelson, Mopey's mother, also testified for the defense. On May 3, 1988, she had a conversation with her daughter. Nelson testified she asked her daughter if she had purchased a gun from the defendant, and her daughter told her that she had not. Mopey also testified for the defense and stated she did not recall the May 3, 1988, conversation with her mother. Mopey testified she might have had a conversation at some point with her mother about purchasing the gun, but thought she told her mother that she purchased it from both Coleman and the defendant.

Jacqueline Bland Danley testified as to an alibi for the defendant. During the evening of April 8, 1988, she testified she was at home with Jeff Kimble, the defendant, and several other individuals. Danley stated the defendant watched her children for her from 7:30 until 9 p.m. She testified she returned home at approximately 9 p.m. and Childrous stayed at the house the rest of the evening without leaving. She was certain of the date because she checked her pay stubs and also because this was her mother's birthday. Danley acknowledged that the day of the trial was the first time she told anyone the defendant was home all evening with her on April 8, 1988.

### C. REBUTTAL CASE

The State called Officer Steve Pellegrini in rebuttal to the testimony of Lee and Horrighs. Pellegrini testified he talked to both men about the shooting immediately after he arrived at the scene on the early morning of April 9. Pellegrini testified at the time of the interview both of the men were under the influence of alcohol.

Detective Tom Murphy testified that when he arrested the defendant on May 3, 1988, he advised him of his *Miranda* rights and defendant elected to talk to police. Murphy testified the defendant told the police Danley was working at Hope School on the evening of April 8, 1988.

Christine Hickey, an employee of the Inner City Mission, at 720 North Seventh Street in Springfield, testified regarding the events occurring on April 8, 1988. Hickey testified she looked out her window at 11:45 p.m., after hearing screams and shots, and saw Akers lying on the sidewalk. Hickey further testified she went outside with Tracy Hamilton from next door and waited near Akers' body for the police to arrive. Hickey testified a group of five to six children walked by

the area and she placed the age of these children at between 9 and 11 years old. Hickey testified the children walked north on Seventh Street and then turned west on Enos Street.

On July 29, 1988, the jury found defendant guilty of murder and armed robbery. The jury found the defendant was eligible for the death penalty, but declined to impose it. At the sentencing hearing on October 28, 1988, defense counsel objected to a "victim impact" letter written by the mother of Beth Akers and attached to the presentence report. The trial judge responded that it was "pretty hard ***, not to consider" that letter, but that other factors were of greater persuasion to the court. Defendant's motion for a new trial was denied.

## II. ADMISSIBILITY OF COLEMAN'S OUT-OF-COURT STATEMENTS

Defendant first argues that the introduction, over objection, of the out-of-court statements made by Coleman was highly prejudicial and improper and denied defendant his Federal and State constitutional rights of confrontation. Defendant also urges these statements were inadmissible under the coconspirator exception to the hearsay rule and, thus, the State had to establish the reliability of these statements through other independent evidence. This was not done in this case and, further, no limiting instruction was given regarding these statements. Therefore, defendant maintains his convictions must be reversed.

The State urges Coleman's statements are admissible (1) under the coconspirator exception to the hearsay rule; (2) as adopted admissions by the defendant; and (3) under the principle of interlocking confessions and admissions. The State argues defendant waived any constitutional issue on the admission of these statements because this ground for objection was not raised at trial. Alternatively, the State argues any error in admitting Coleman's statements was harmless, given the overwhelming evidence of defendant's guilt.

### A. HEARSAY

■■ We first address the hearsay issue. Under the coconspirator exception to the hearsay rule, any act or declaration (1) by a coconspirator of a party, (2) committed in furtherance of the conspiracy, and (3) during its pendency is admissible against each and every coconspirator, provided that (4) a foundation for its reception is laid by independent proof of the conspiracy. (*People v. Parmly* (1987), 117 Ill. 2d 386, 512 N.E.2d 1213; *People v. Eddington* (1984), 129 Ill. App. 3d 745, 771, 473 N.E.2d 103, 121.) This exception does not extend to a recitation of past facts. (*People v. Goodman* (1980), 81 Ill. 2d 278, 408

N.E.2d 215; *Dutton v. Evans* (1970), 400 U.S. 74, 88-89, 27 L. Ed. 2d 213, 227, 91 S. Ct. 210, 219-20.) Declarations that are merely narrative as to what has been done or will be done are incompetent, however, and should not be admitted except as against the defendant making them or in whose presence they are made. *Eddington,* 129 Ill. App. 3d at 772, 473 N.E.2d at 122; *Spies v. People* (1887), 122 Ill. 1, 237, 12 N.E. 865, 907-08.

■ Of the eight statements attributed to Coleman, four statements relate to a continuation of the original conspiracy in crime: those of April 8 (two statements), April 13, and April 28. The actions of Coleman and the defendant on April 8, 1988, relate directly to the planning and execution of the robbery. We find the two statements attributed to Coleman on this day were admissible under the coconspirator exception. The State introduced independent evidence of the conspiracy through the testimony of six jailhouse informants, each with a criminal record. The credibility of these witnesses and the weight given to their testimony are within the prerogative of the trier of fact. (*People v. Fields* (1990), 135 Ill. 2d 18, 48.) A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of evidence or credibility of witnesses. *Fields* (1990), 135 Ill. 2d at 48.

■ On April 13, 1988, five days later, the defendant and Coleman were attempting to dispose of the gun used in the robbery. On April 28, defendant and Coleman were attempting to dispose of bank checks taken in the robbery. These actions amount to concealment of the crime, which may constitute a continuance of the original conspiracy for purposes of this exception. (*People v. Link* (1981), 100 Ill. App. 3d 1000, 427 N.E.2d 589; *People v. McInnis* (1980), 88 Ill. App. 3d 555, 411 N.E.2d 26; *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801.) However, only those concealment efforts proximate in time to the principal crime should be considered as part of the ongoing conspiracy. As stated in *Meagher*:

> "When acts or declarations directed towards concealment are distant from the commission of the offense, they are subject to such grave doubts as to their trustworthiness that they should not be admissible under the co-conspirator exception." *Meagher,* 70 Ill. App. 3d at 603, 388 N.E.2d at 805.

We find the actions of defendant and Coleman on April 13 and April 28 were not proximate enough to the robbery on April 8 to constitute an ongoing conspiracy. This court in *Eddington* discussed when the conspiracy relating to the original crime terminates and agreed with the *Meagher* court that concealment efforts must be proximate

in time to the underlying offense. In *Eddington,* we relied in part on *United States v. Floyd* (2d Cir. 1977), 555 F.2d 45, where the Federal court stated:

> "The established rule is that once 'the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.' [Citations.] *** To include in the conspiracy an event, no matter how proximately related, occurring after the main objectives of a conspiracy have been accomplished would unnecessarily blur the relatively clear line drawn by the Supreme Court's decisions on this subject." (*Floyd*, 555 F.2d at 48.)

While the statements regarding actions taken on April 13 and 28 are not admissible under the coconspirator exception, they were admissible as admissions.

### B. ADMISSIONS

■ When a statement is made in the presence and hearing of an accused, incriminating in character, and such a statement is not denied, contradicted or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of his acquiescence in its truth. (*People v. Morgan* (1976), 44 Ill. App. 3d 459, 462, 358 N.E.2d 280, 283.) Acquiescence or assent may be manifested by silence or by an evasive, equivocal, or unresponsive reply. *People v. Allen* (1983), 119 Ill. App. 3d 186, 194, 456 N.E.2d 336, 341.

■ The State argues all of the statements were admissible as implied admissions because they were made in defendant's presence. We find, with two exceptions, that six of the statements attributable to Coleman were made in the presence of the defendant: the statements Coleman made to Kimble on April 8; the statements Coleman made to Kimble on April 9 at the defendant's mother's house; and the statements made on April 14, April 15, and April 28. Defendant argues the State failed to establish the "degree" to which defendant was present when Coleman made the incriminating statements. We find no merit in this argument. The evidence established that the defendant and Coleman on April 8 stated *they* were going to get some money. After the robbery, defendant and Coleman returned to Kimble's house whereupon *they* told Kimble *they* snatched a purse. On April 9, Kimble testified regarding a conversation between the defendant and

Coleman after Kimble tossed a newspaper to defendant which contained a story regarding the Akers murder. Similarly, defendant was present (1) when the gun was sold to Mopey; (2) on April 15 when defendant and Coleman told Kimble *they* sold the gun to Mopey; and (3) on April 28 when defendant and Coleman talked to Mopey about who shot the victim and the possible return of the gun to them. All these statements were admissible against the defendant.

■ Two statements attributed to Coleman on April 10 and April 11 were made outside the defendant's presence and were not admissible as admissions. Further, these statements do not qualify under the coconspirator exception because Coleman was relating past facts and not engaging in any concealment efforts. However, an objection to the April 11 statements on hearsay grounds was sustained. It was error to admit the April 10 statement. However, in light of the other statements which were admissible and the overwhelming evidence of defendant's guilt, we find any error attributable to this statement was harmless beyond a reasonable doubt. *People v. Arman* (1989), 131 Ill. 2d 115, 124, 545 N.E.2d 658, 662.

Based on our conclusion that Coleman's statements were admissible as exceptions to the hearsay rule and as admissions, we need not address the alternate arguments raised by the parties on this issue.

### III. JURY INSTRUCTIONS ON ARMED ROBBERY

Defendant next argues the jury instructions for armed robbery were deficient because they failed to include a mental state. Defendant contends the instructions relieved the State of its burden of proof with respect to an essential element of the crime and constitute plain error. The defendant acknowledges this court's decisions in *People v. Talley* (1988), 177 Ill. App. 3d 170, 531 N.E.2d 1139, and *People v. Avant* (1989), 178 Ill. App. 3d 139, 532 N.E.2d 1141, holding a mental state is not an essential element for jury instructions on robbery and armed robbery. However, the defendant urges this court to reconsider the decisions in *Talley* and *Avant*.

The State argues the defendant waived this argument because defense counsel did not tender alternate instructions, did not object to the tendered instructions, and did not raise this issue in a post-trial motion. On the merits, the State argues *Talley* and *Avant* are dispositive of this issue and the other cases cited by the defendant are distinguishable.

■ Defendant did not object to the armed robbery instruction or offer alternate instructions and, therefore, this issue is waived. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.) On the merits,

defendant's argument has previously been considered and rejected by this court on numerous occasions and we see no reason to depart from our previous holdings on this issue.

## IV. VICTIM-IMPACT EVIDENCE

Defendant also argues the receipt into evidence of a victim-impact letter from Akers' mother denied defendant a fair sentencing hearing. Thus, defendant asks for a remand for a new sentencing hearing.

The State argues this is not a capital offense case and the impact statement was not received into evidence at the death-penalty hearing. Further, the State argues the record clearly shows the judge considered other matters, such as defendant's criminal background and the circumstances surrounding the commission of the robbery, and in fact stated he was not relying heavily on the impact evidence in sentencing the defendant.

In *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, the Supreme Court held the presentation at a capital sentencing hearing of evidence of the victim's personal traits and the impact of the offense on the victim's family violates the eighth amendment proscription against cruel and unusual punishment. In *Booth,* the State trial court allowed the introduction of victim-impact evidence at the stage of the trial where the jury passed upon the question as to whether the death penalty should be imposed.

■ *Booth* is inapposite to the case presented. Here, the handwritten victim-impact letter was attached to the presentence report. It was *not* presented to the jury in its deliberations on the imposition of the death penalty. Further, this court in *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362, held the introduction of such evidence at sentencing does not violate the eighth amendment.

For the foregoing reasons, defendant's convictions and sentences for armed robbery and murder are affirmed.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.