THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RODNEY ERVIN, Defendant-Appellant.

Fourth District   No. 4—91—0531

Opinion filed March 19, 1992.

834

Daniel D. Yuhas and David P. Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Defendant Rodney Ervin was charged by information with first-degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)). Following a jury trial, he was convicted and sentenced to 25 years' imprisonment. He now appeals, contending that (1) the trial court erred in admitting certain hearsay statements of two of his codefendants into evidence; and (2) the prosecutor committed reversible error in making certain statements to the jury in his closing argument.

Defendant was charged with the murder of Charles George (George), along with codefendants Jimmy Brooks (Brooks), Anthony Ervin (Anthony) and Shirley Ervin (Shirley). Anthony is defendant's brother and Shirley is his wife. It was alleged that defendant, Brooks,

and Anthony concocted a plan to steal drugs from George, who was a drug dealer. It was also alleged that although the defendant (who knew George) was not personally present when George was stabbed by Brooks and/or Anthony in the robbery attempt, he was legally accountable for their conduct. Shirley drove the getaway car. All this occurred during the early morning hours of January 3, 1991.

Brooks and Anthony were tried together first. While their jury was deliberating, they entered into a negotiated plea agreement with the State, whereby they pleaded guilty to killing George while attempting to rob him. Brooks was sentenced to 25 years' imprisonment, while Anthony was sentenced to 20 years' imprisonment.

During the State's case, Elizabeth Hodges (Hodges) testified that she and her children were living with George. Shortly after midnight on January 3, 1991, defendant came to the door of her home and she let him in. Defendant asked George to sell him some cocaine, to which George replied that it had been a long day and he was getting ready to go to bed. Defendant then asked George if he wanted to attend a party in the neighborhood and gestured toward Union Street. Defendant was jittery while he was in the house; he was speaking rapidly and glancing around the room as he spoke. George declined to go to the party, defendant left, and George locked the door. About 20 minutes later, two black males Hodges had never seen before knocked on the door. She later identified them from photographs as Brooks and Anthony. They were permitted to enter. When George asked how he could help them, Brooks said, "We have been sent here to take your drugs." Defense counsel's objection to this statement was overruled. Hodges then testified that Brooks hit George with a wooden stick which broke in two pieces. George had pulled a knife, which he dropped as he fell to the floor. He then went into the dining room, followed by Brooks. Anthony then grabbed Hodges' hair and asked her where the drugs were. Defense counsel's objection to this statement was also overruled. Hodges pointed out the drugs to Anthony. He let Hodges go and went into the dining room, where George was swinging a machete at Brooks. George fell to the floor, and Brooks straddled him and began stabbing him in the back with a knife. Hodges observed Anthony making stabbing motions at George's side. Both men then ran out the door. Hodges identified a bag of marijuana as belonging to George.

On cross-examination, Hodges testified that George locked the door when defendant left, but she later went out to the car to get the keys and left the door unlocked when she returned to the house. Defense counsel questioned her about three previous statements she had

given to the police. In one statement she said that Brooks stated he and Anthony had been sent to the George house by a friend. In the other statement she said Brooks simply announced that he and Anthony had been sent there. In yet another statement, Hodges told the officer Brooks said, "We have been sent." She further testified that she could not be certain the bag of marijuana was the same one George had. She also testified a juvenile proceeding had been filed against her because of her involvement in the incident, that she had already lost custody of her daughter, and that she expected to lose custody of her son. She also hoped she might regain custody through her cooperation with the State in testifying against defendant.

Officer John Beggs testified that he searched defendant's car and found a jacket with bloodstains on it. A baggie containing marijuana was found in the coat pocket, and there were fresh bloodstains in the backseat area of the car. He also found a toilet plunger with no handle. The officer demonstrated for the jury how one of the pieces of the stick used to hit George fit into the toilet plunger head.

Shirley testified that on the night of January 2, 1991, she and defendant were expecting a visit from Anthony, his wife and children, and Brooks, who were driving to Decatur from their homes in Cook County. Shortly after their arrival, defendant, Anthony, and Brooks left the house. They took defendant's car and were gone about 45 minutes to an hour. She did not know where they had gone. After they returned, everyone sat in the dining room. Brooks and Anthony asked about quick ways to make money in Decatur. Defendant, Brooks, and Anthony then went into the kitchen for about 20 to 30 minutes, where defendant cut Anthony's hair. Shirley was in the living room at that time and could not hear any of their conversation. The three men then went into the bathroom, closed the door, and stayed there about 5 to 10 minutes. Again, she could not hear any of their conversation. When the men emerged from the bathroom, they went back into the kitchen, where they stayed about 30 minutes. While they were in the kitchen, she heard a voice ask, "Who is going to drive?" She did not know who asked this question. She then heard defendant say, "Shirley's going to drive."

Defendant approached Shirley in the living room and asked her to drive him to an undisclosed destination. Shirley, defendant, Brooks, and Anthony all got into the car. The defendant told Shirley where to drive and to park the car on Union Street about half a block from George's house. She could not see his house from the car. She indicated she knew who George was and that defendant had previously purchased cocaine from him. While she was driving, the three men

were huddled and talking among themselves. She heard the word "robbery," and defendant said, "I know a guy." Defendant then told Brooks and Anthony that he would go to the house "first" and they were to stay in the car until he returned.

Over defense counsel's objection, Shirley testified as to conversation between Brooks and Anthony outside defendant's presence. She testified that Anthony told Brooks he was going to go to a house and cut a phone wire and Brooks told him not to. The two men then said to each other, "How are we going to do this?" When defendant returned to the car approximately 5 to 10 minutes later, he told Brooks and Anthony, "Old boy's sitting in the house watching TV, and that I left the front door unlocked for you two." Brooks and Anthony left the car. Defendant told them to tell "the guy" that Eddie (George's brother) sent them. Brooks and Anthony were gone about five minutes. Shirley wanted to leave before they returned, but defendant prevented her from doing so.

When Brooks and Anthony returned to the car, they both said they had been cut. They both sat in the backseat behind defendant and Shirley. Anthony then told defendant, "Rodney, man, wasn't nothing in there but a bag of weed." Defendant responded, "Man, I know there was some coke in there. I seen it when I went in the house by myself." Anthony gave defendant a rolled-up baggie of marijuana. She noticed that Brooks did not have on the L.A. Kings cap he had been wearing before he got out of the car. Brooks commented that he must have dropped the cap in the house. Brooks then told Anthony he stabbed "him" three times. Anthony responded that he had not laid a hand on "him"; the only thing he did was to hold a "girl" back by her neck. Shirley was asked by Brooks and Anthony to take them to whichever hospital the "guy" would not be taken to. She did not know who the "guy" was. She told the three men that if they had hurt someone they would all go to jail, regardless of which hospital she took them to. While she was driving to the hospital, the three men talked about how to explain the cuts to hospital personnel. Defendant told Brooks to say he had cut his hand while chopping a ham, and told Anthony to say he had cut his hand while carving a turkey. While they were at the hospital, Shirley heard over the intercom that a white Caucasian male was being transferred. She and defendant got in the car to leave, along with Anthony. Brooks was still in the hospital emergency room. When asked why he had not received treatment, Anthony said he had heard a Caucasian male was being transferred to the hospital and was not expected to live. He said he did not want to go back to jail.

Shirley drove home and parked the car behind the house. After they went into the house, defendant told Anthony to tell police he had cut his hand carving a turkey. He told Shirley, Anthony, and Anthony's wife to tell police that Brooks left the house alone and came back with a cut hand, and that they took him to the hospital. Shirley testified that defendant said he did not think Brooks would "squeal," but that Anthony said he thought Brooks would tell. Defendant told Anthony that if anyone got into trouble, all three of them would "go down." Shirley was told to stick to the story. Later that morning, the police came to the house and arrested defendant and Anthony. Shirley was also arrested and charged with first-degree murder. She subsequently entered into a plea agreement with the State, in which she agreed to testify against defendant in exchange for reduction of her charge to armed robbery. She testified that she knew she was facing 6 to 30 years' imprisonment and would not be eligible for probation.

On cross-examination, Shirley testified that defendant, Brooks, and Anthony brought beer back with them after they initially left the house, but that they did not say where they had gone. Defense counsel attempted to impeach Shirley by pointing out she had testified at her guilty-plea hearing that the three men had gone into the bathroom first for about 5 to 10 minutes and then into the kitchen, where defendant began cutting Anthony's hair. Defense counsel also pointed out Shirley had previously made a statement to police that Brooks had told her where to drive. In another statement, she said nothing about defendant telling Brooks and Anthony he had left the door to George's house unlocked for them. She also did not tell police in the statement that defendant told Brooks and Anthony to tell George that Eddie sent them. Shirley also admitted she was angry with defendant because she believed he was responsible for her involvement.

Detective Carpenter of the Decatur police department testified to an oral statement given to him by defendant. He said defendant told him Shirley had cooked a turkey for their dinner. He, Brooks, and Anthony went to Mr. Lucky's to buy liquor. When they arrived back at the house, they all sat around drinking. They decided to get some marijuana. He, Shirley, and Brooks went to George's house, while Anthony and his wife stayed at the house. Defendant went into George's house alone and asked George to sell him a "nickle bag" ($5 worth) of marijuana. George offered to sell him an eighth of an ounce for $40, but refused to sell him only a nickel bag. Defendant left, and he, Shirley, and Brooks went back to his house. Brooks left the house later and returned with a bad cut on his hand. After that, Anthony

cut his hand carving the turkey—or so defendant assumed. The detective also testified that defendant gave him a written statement. In that statement, defendant said he was watching television when Brooks knocked on the door, screaming he had cut his hand. Then Anthony cut his hand. On the way to the hospital Anthony complained he had no money to pay the bill, and for this reason he gave hospital personnel a fictitious name. Defendant, Shirley, and Anthony then left the hospital.

Two police officers testified for the defense concerning statements given to them by Hodges (George's girlfriend). She told one officer that after defendant left George's house, neither she nor George locked the door. She told the other officer that when Brooks and Anthony entered the house, they said they had been sent by a friend.

Defendant testified on his own behalf. He stated he had been convicted of forgery and robbery in 1988. He, Brooks, and Anthony went to get some beer and cigarettes at a liquor store about two blocks from defendant's house. They went past a club or tavern and then went back to defendant's house, where they all started drinking. They began discussing Anthony's hairstyle; then he, Anthony, and Brooks went into the bathroom to decide how to cut Anthony's hair. They then went into the kitchen, where he began cutting the hair. Brooks asked about fast ways to make money, but no one talked of robbing anyone. In the kitchen they were talking about a friend of defendant's who had been selling cocaine and was fatally shot. Anthony asked about marijuana, and defendant said he would see if George would "front" him some, i.e., allow him to buy some on credit. He decided not to drive, because he believed Shirley would not allow it since she had recently paid several hundred dollars in traffic tickets for him. She had been upset that he had previously driven the car that evening, and so he asked her to drive them to George's house. Brooks and Anthony went with them. They stopped the car in front of George's house. Defendant went in and asked George to front him a nickel bag. George told him to come back later and he would. As he left, defendant advised George to lock his doors before he wound up getting raided.

When he got back to the car, Brooks and Anthony asked him if he got the marijuana. He told them, "No, old boy's in the house watching TV. He told me to come back in fifteen to thirty minutes." Shirley started to drive away. When they were about a half block away from George's house, Brooks told her to stop—he had to do something. Defendant believed he had to go to the bathroom. Brooks told Anthony to go with him. Defendant noticed the two of them standing

on the corner talking. He thought they were both going to the bathroom. He dozed off in the car and woke up when Shirley started the car. He noticed that Brooks and Anthony had not returned. He stopped Shirley from leaving, concerned because it was a cold night and that Brooks and Anthony would not know how to get back to his house. When Brooks and Anthony got back to the car, they said Brooks had gotten into a fight but did not say with whom. Defendant noticed Brooks' hands were covered with blood. Brooks said the person with whom he had been fighting had his money and he (Brooks) did not get his drugs. No one gave defendant a baggie; he did have a baggie in his hand, but it only contained some candy. When they arrived at the hospital, defendant tried to clean the blood off the back seat of the car with some paper towels. It was then he was told the man with whom Brooks fought was white. They left the hospital. Shirley went back to the hospital later to pick up Brooks. She came back to the house and said the police were at the hospital with Brooks. Defendant testified he became afraid they would all be arrested, and he then told everyone what story to give the police. The statement he initially gave to police was the one he told everyone to use. He also testified that the reason he told Brooks and Anthony he would go to George's door by himself was because George had told him he did not like strangers around his house at night. He testified when Shirley heard the word "robbery" in the car, that he, Brooks, and Anthony were talking about his best friend in Chicago who had committed a robbery. Anthony was going to be moving to Decatur, and he asked defendant what he and Brooks should do if they could not find him and they wanted to get some marijuana from George. Defendant testified he told them to tell George that he or Eddie had sent them. He denied he made any plan with Brooks and Anthony to rob George.

On rebuttal, Detective Carpenter testified that defendant did not tell him in any of the statements given by him that he dozed off in the car while Brooks and Anthony were gone or that George had told him to come back later and he would front defendant some marijuana.

After deliberating less than 15 minutes, the jury returned a verdict of guilty.

Defendant's first claim of error on appeal is that the trial court erred in admitting statements made by Brooks and Anthony. These statements were admitted under the coconspirator exception to the hearsay rule. Defendant contends the State had not established the existence of a conspiracy by evidence independent of the hearsay and, therefore, the statements should not have been admitted. Defendant

objects to the following: (1) the statement by Brooks (testified to by Hodges) that he and Anthony had been sent to George's house to take his drugs; (2) the question asked by Anthony (again, testified to by Hodges) as to the location of George's drugs; (3) the question by Brooks or Anthony in defendant's kitchen (testified to by Shirley) as to who would drive the car and defendant's response that Shirley would drive; (4) Shirley's testimony concerning statements made by Brooks and Anthony in the car while defendant was in George's house about cutting a telephone wire and asking "how are we going to do this"; and (5) the statements made by defendant to Brooks and Anthony that he had left the door to George's house unlocked for them and they should tell George that Eddie had sent them.

■ The objection to Shirley's testimony about defendant's statement that he had left George's door unlocked for Brooks and Anthony, *i.e.*, (5) above, was objected to as being unresponsive to the prosecutor's question to Shirley. No objection to either of these statements was raised in defendant's post-trial motion. In addition, defense counsel did not raise any claim of error in his post-trial motion about Shirley's testimony concerning the question asked in the kitchen of defendant's house as to who would drive the car and defendant's response that Shirley would drive, *i.e.*, (3) above. We also note that defense counsel did not object to the statement made by defendant to Brooks and Anthony that George was sitting in the house watching television.

It is the law in this State that counsel must make an objection at trial and raise it again in a post-trial motion to preserve an issue for appellate review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) Failure to do so constitutes a waiver of any issues not thus properly preserved. The trial court properly overruled defense counsel's objection to Shirley's testimony that defendant said he had left George's door unlocked for Brooks and Anthony, *i.e.*, (5) above. The prosecutor, as the questioning counsel, was the only one with standing to make this objection. (See *Hester v. Goldsbury* (1965), 64 Ill. App. 2d 66, 71, 212 N.E.2d 316, 319.) In addition, a specific objection at trial waives all grounds not stated. (*People v. Williams* (1983), 97 Ill. 2d 252, 288, 454 N.E.2d 220, 237.) Therefore, we decline to consider any alleged error in connection with these statements, *i.e.*, (3) and (5) above.

■ This leaves us with the question of whether statements made by Brooks and Anthony outside defendant's presence were properly admitted into evidence, *i.e.*, (1), (2), and (4) above. The trial court admitted these statements on the basis that they were within the cocon-

spirator exception to the hearsay rule. A concise statement of this rule is found in *People v. Meagher* (1979), 70 Ill. App. 3d 597, 601, 388 N.E.2d 801, 803:

"The co-conspirator exception to the hearsay rule is well known. The acts and declarations of a co-conspirator in furtherance of the conspiracy are admissible against another who is a defendant, even when the acts and declarations are made out of the presence of the defendant. (*People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975.) No conspiracy need be charged and so long as a prima facie case of conspiracy has been shown by independent evidence, acts or declarations in furtherance of the conspiracy are admissible. See *People v. Jackson* (1977), 49 Ill. App. 3d 1018, 364 N.E.2d 975; *People v. Morrow* (1976), 40 Ill. App. 3d 1020, 353 N.E.2d 354."

This court has held that the State must make an independent, *prima facie* evidentiary showing of the existence of a conspiracy between the declarant and the defendant. While such evidence may be totally circumstantial, it must be sufficient, substantial, and independent of the declarations made in order for hearsay statements to be admitted under the coconspirator exception. (*People v. Duckworth* (1989), 180 Ill. App. 3d 792, 795, 536 N.E.2d 469, 471.) If hearsay statements of an alleged coconspirator were allowed to serve as evidence of the very existence of the conspiracy, such hearsay would "lift itself by its own bootstraps to the level of competent evidence." *Glasser v. United States* (1942), 315 U.S. 60, 75, 86 L. Ed. 680, 701, 62 S. Ct. 457, 467.

The State insists that sufficient independent evidence was introduced at trial to provide the required foundation for admission of the hearsay statements of Brooks and Anthony. It points to the following evidence, which it says established the existence of a conspiracy among defendant, Brooks, and Anthony: (1) defendant's absence from the house for approximately 45 minutes with Brooks and Anthony during which, according to the State's theory, the trio "undoubtedly 'cased' " George's house, since they would not otherwise have been gone so long to run errands at places only two blocks from defendant's house; (2) defendant's consultation with Brooks and Anthony in the bathroom of his house following the discussion of fast ways to make money and the ensuing conversation in the kitchen about who was going to drive the car; (3) defendant's enlistment of Shirley to drive the getaway car, his refusal to tell her their destination, and his direction to her to park half a block from George's house; (4) defendant's huddled conference with Brooks and Anthony in the car on the way to George's house, during which Shirley heard the word "robbery" and defendant said "I know a

guy"; (5) defendant's statement to Brooks and Anthony that he would go into the house by himself first and his instruction to them to remain in the car until he returned; (6) defendant's nervousness in scanning the premises while he was talking to George and his suggestion that George accompany him to a party in the area where the car was parked, after George had said he was tired and intended to go to bed; (7) defendant's statement to Brooks and Anthony that George was watching television, he had left the door unlocked for them, and they should tell George that Eddie had sent them; (8) Brooks' use of the toilet plunger handle as a weapon against George and what the State suggests as the likelihood that the trio decided to use the plunger while they were in the bathroom; (9) defendant's refusal to allow Shirley to drive away before Brooks and Anthony returned to the car; (10) Anthony's statement he had seen no drugs in the house except the bag of marijuana, and defendant's response that he had seen cocaine while he had been in the house talking to George; and (11) defendant's fabrication of stories for the others to tell hospital personnel and the police.

■ We agree with the State that sufficient evidence was introduced, independent of the hearsay statements, to establish a *prima facie* showing of the existence of a conspiracy to rob George. Most of the evidentiary points enumerated above, taken together, establish sufficient circumstantial evidence of a conspiracy.

Defendant refused to tell Shirley of their destination and told her to park half a block from George's house. Had defendant merely been going to George's house to purchase drugs, this secrecy would have been unnecessary. Along the same lines, had the conversation in the car between defendant, Brooks, and Anthony been innocent as defendant testified, it would have been unnecessary for them to huddle together in an apparent attempt to keep Shirley from hearing what they were saying. Defendant told Brooks and Anthony he would go into George's house *first* and that they were to remain in the car *until he returned*. This statement is inconsistent with defendant's testimony that his intent all along was to simply ask George to allow him to buy some marijuana on credit. The obvious implication of such a statement was that defendant intended to "case" the situation inside George's house to pave the way for Brooks and Anthony to enter the house. Further, defendant's nervous behavior in the house, as testified to by Elizabeth Hodges, could be interpreted as indicating criminal intentions. The same can be said concerning defendant's attempt to lure George out of the house with suggestions he attend a party in the general direction of defendant's parked car. Defendant then told Brooks and Anthony when he returned to the car that the door to George's house was unlocked and they should tell

George that Eddie sent them. Defendant testified that George told him he did not like strangers at his house at night. If Brooks and Anthony told George his brother had sent them, this might persuade George to allow them into the house.

Anthony's complaint to defendant, after he and Brooks returned to the car, that he had found only a bag of marijuana in the house and defendant's response that he knew there was cocaine in the house because he had seen it while he was there, strongly suggests that defendant knew exactly where Brooks and Anthony were during their absence from the car. Finally, defendant admitted fabricating a story to tell hospital personnel how Brooks and Anthony had cut their hands. He admitted attempting to clean the blood from the backseat of the car. He further admitted to fabricating a story for Shirley and Anthony to tell police upon their anticipated arrival at his house. He further gave more than one false statement to police himself. Concealment efforts that are proximate in time to the principal offense are considered to be part of the ongoing conspiracy. *People v. Childrous* (1990), 196 Ill. App. 3d 38, 52, 552 N.E.2d 1252, 1261, *appeal denied* (1990), 133 Ill. 2d 562, 561 N.E.2d 696.

Having decided that the State, through independent evidence, established the existence of a conspiracy between defendant, Brooks, and Anthony to rob George of his drugs, we find the complained-of statements made by Brooks and Anthony were properly admitted under the coconspirator exception to the hearsay rule.

Defendant's final claim of error concerns certain statements made by the prosecutor during closing argument. During his closing argument, the prosecutor stated:

"MR. CURRENT [(Assistant State's Attorney)]: *** Finally, there comes a time in a person's life when you have to face the punishment for an illegal act you've done. Some people call that paying the piper. Well, let's examine who has paid the piper in this case. Let's talk about Chuck George. Has Chuck George paid the piper?

MR. BAXTER [(Defense counsel)]: Objection, Your Honor.

THE COURT: Overruled.

MR. CURRENT: In the State of Illinois, there is no death penalty for being a drug dealer. You may not like drug dealers. I don't like drug dealers, but there is no death penalty in the State of Illinois for being a drug dealer. Well, how has Chuck George paid the piper? He's paid the piper with his life. What about Elizabeth Hodges? Has she ever paid the piper? I would agree with you that's a pretty reprehensible woman who would have her kids

in such a setting. That's just no excuse. Well, what do you find out? You find out through the State's Attorney's actions. Are they codling [sic] some woman who acknowledges that her kids were in such an environment? She told you she has lost custody of her daughter, and she is ready to lose custody of her son. I'd suggest Elizabeth Hodges has paid the piper. What about Jimmy Brooks and Anthony Ervin? They have had there [sic] day in court. What about Shirley Ervin? Is she walking out of this courtroom scott free [sic][?] Probation, no. Sentence, six to thirty years. What did she do? She drove the car. Six to thirty years for Armed Robbery; she drove the car. Shirley Ervin went back to jail after she testified.

Now, what about Rodney Ervin? Everybody's paid the piper, haven't they; but what about Rodney Ervin? Rodney Ervin wants to walk out of the courtroom a free man. Compare what Shirley Ervin did with what Rodney Ervin did. Is that fair? Is Rodney Ervin going to walk out of this courtroom a free man? You, as jurors and citizens of Macon County, have a right to expect a fearless administration of justice. You as the citizens and jurors of Macon County ultimately decide what kind of community you are going to live in. People agree drugs are a terrible thing. Drugs are a scourge on society. Now is you are [sic] chance as citizens of Macon County to be a soldier in the war on drugs. You, as jurors, have a right to say, I will not tolerate those who sell drugs and those who kill over drugs. How is the vicious cycle going to end? Only through the actions of responsible citizens like yourself. There is a slogan that goes around about drugs, and we all might think it's trite or whatever, but it says, just say no. You, as citizens, have the chance to say, no, I won't take this any longer. I will not live in a community like this any longer."

In rebuttal argument, the prosecutor said:

"Justice isn't an unfamiliar word. Shirley Ervin has come to court and admitted her participation and is facing six to thirty with no probation for driving a car. This man says, let me go scott free [sic]. Is that justice?"

Defendant contends these statements constituted plain error and that we should reverse his conviction and remand for a new trial. He believes the comments made about Shirley, Brooks, Anthony, George, and Hodges having all paid "the piper" and about his wanting to avoid paying "the piper," wanting to go scot-free, or wanting to walk out of the courtroom a free man, were improper because they sought to persuade the jury to convict him for exercising his constitutional right to go

to trial rather than to plead guilty. He further believes the prosecutor impermissibly urged the jury to convict him in order to strike a blow in the war against drugs in the community. He says these arguments were an improper attempt to appeal to the jury's fears about criminal activity unrelated to him. In his view, these comments shifted the jury's attention away from its task of deciding his guilt or innocence based upon the evidence presented at the trial and created the risk that its decision would be based on fears about society's drug problems.

Initially we note that defense counsel did not object to the comments about defendant wanting to walk out of court a free man or about the jury's part in the war on drugs. Neither did he object to the prosecutor's rebuttal argument. Defendant's post-trial motion only specified error as to the comments about Shirley's sentencing possibilities and the comment about George having "paid the piper." As we have said, preservation of error for review requires a defendant to object at trial and to raise the issue in a post-trial motion. (*Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130.) Therefore, our consideration of defendant's objections to the prosecutor's comments not so preserved must depend upon whether those comments constitute plain error. Plain error exists when an error affects the substantial rights of a defendant or the evidence is closely balanced. *People v. Griffiths* (1983), 112 Ill. App. 3d 322, 326, 445 N.E.2d 521, 526; *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 858.

Prosecutors are allowed great latitude in closing argument. In determining whether error exists, each case must be considered upon its own facts. A prosecutor may comment upon the evidence and legitimate inferences therefrom. A prosecutor may also respond to an argument by defense counsel which invites or provokes a response. The substance of closing arguments is within the sound discretion of the trial court, and its findings will not be disturbed absent extreme error. (*People v. James* (1990), 200 Ill. App. 3d 380, 393, 558 N.E.2d 732, 740-41, *appeal denied* (1990), 135 Ill. 2d 562, 564 N.E.2d 843.) A prosecutor may comment upon the evil results of crime and the benefits of a fearless administration of the law. (*People v. Jackson* (1981), 84 Ill. 2d 350, 360, 418 N.E.2d 739, 744.) However, it is improper for the prosecutor to argue assumptions or facts which are not based upon the evidence. (*People v. Smith* (1990), 141 Ill. 2d 40, 60, 565 N.E.2d 900, 908.) Nor may a prosecutor make statements in summation which are not relevant to the defendant's guilt or innocence and which can only serve to inflame the jury. *People v. Caballero* (1989), 126 Ill. 2d 248, 271, 533 N.E.2d 1089, 1097.

The test to be applied in determining whether reversal is required is whether the alleged improper remarks are so prejudicial that defendant

did not receive a fair trial, *i.e.*, whether it can be said the jury's verdict might have been different absent the improper remarks. *People v. Hunter* (1984), 124 Ill. App. 3d 516, 549, 464 N.E.2d 659, 684; *People v. Jenkins* (1989), 190 Ill. App. 3d 115, 135, 545 N.E.2d 986, 999, *appeal denied* (1990), 129 Ill. 2d 568, 550 N.E.2d 562; *People v. Brown* (1986), 146 Ill. App. 3d 101, 106, 496 N.E.2d 1020, 1023.

We find no error in the prosecutor's remarks to which defendant objected at trial and which were raised as error in his post-trial motion. The prosecutor's statements regarding Shirley's likely sentence under her plea of guilty to armed robbery merely restated elicited testimony from Shirley during the trial. Remarks about other parties to the incident having "paid the piper" were made after the prosecutor had discussed the felony murder doctrine and the parts played by George, Shirley, Hodges, Brooks, and Anthony. The prosecutor could properly suggest to the jury that others involved in the offense had been punished or would be punished. This was simply comment on the evidence adduced at trial. There was no error in suggestions by the prosecution to the jury that the administration of justice should dictate that defendant also be punished for his role.

We also find no plain error in other arguments of the prosecutor which were not properly preserved by defendant for our review. As is illustrated by the above discussion of testimony at trial, the evidence was not closely balanced. There was extensive testimony that George was a drug dealer and that defendant, Brooks, and Anthony were at his house for the purpose of robbing George of his drug supply. The prosecutor was not required to ignore the evils of drug-related crime in his argument to the jury. He did not dwell on the subject of drugs. His comments about the evils of drugs were brief and not so egregious as to compel us to find they deprived defendant of a fair trial. We also find nothing to criticize in the prosecutor's rebuttal argument. He was entitled to compare what the evidence tended to show about the respective roles of defendant and Shirley in this offense and to urge the jury to convict defendant.

For the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

STEIGMANN and KNECHT, JJ., concur.