THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RENE SOTO, Defendant-Appellant.

Second District    No. 2—01—0119

Opinion filed November 12, 2002.—Rehearing denied January 15, 2003.

G. Joseph Weller and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Rene Soto, appeals his conviction in the circuit court of Du Page County of two charges of first-degree murder. In this appeal, he raises the following issues: (1) whether the trial court erred in ruling that he consented to have his conversation with a codefendant at a detention facility electronically monitored; (2) whether he was denied his confrontation rights under the state and federal constitutions by the admission of his codefendant's statement made at the detention facility; (3) whether the trial court erred in admitting defendant's refusal to provide handprinting exemplars; (4) whether the prosecutor made unfairly prejudicial misrepresentations and improper comments during closing argument; and (5) whether the trial court erred in refusing to instruct the jury on the offense of conspiracy to commit murder as a lesser included offense of murder by accountability. For the following reasons, we reverse both convictions and remand the cause for a new trial.

## FACTS

Defendant and a codefendant, Raul Ceja, who was tried separately, were indicted for the shooting deaths of Richard Sanchez and Alfredo Garcia. The charges were based on a July 26, 1998, incident in which the victims, who were in a Lincoln Continental, were fatally shot by occupants of a Chevrolet Tahoe at the intersection of Oak Lawn and Grand Avenues in Elmhurst. The indictment against defendant contained five counts as to each victim. All 10 counts were premised on the same factual allegation that defendant "shot [the victim] with a handgun" combined with the operative language from the first-degree murder statute.

The evidence at trial established the following. On July 26, 1998, about 9:25 p.m., Kevin Oldaker and his wife were stopped for a red light at the corner of Grand and Oak Lawn Avenues in Elmhurst. There are four westbound lanes at that point of Grand Avenue with two lanes going straight and an inside left-turn lane and an outside right-turn lane. Oldaker's vehicle was in the right lane of the two

through lanes. As they were waiting for the light to turn green, there was a Lincoln Continental sitting in the left lane of the through lanes next to the Oldaker vehicle. There were two male occupants in the front seat of the Lincoln.

As the light turned green, a Chevrolet Tahoe pulled into the westbound left-turn lane next to the Lincoln. At that point, Oldaker heard glass breaking and gunshots. He observed the front-seat passenger halfway out the front door of the Tahoe shooting a handgun at the Lincoln. There was also a passenger in the rear seat of the Tahoe with his hand sticking out of the rear passenger window shooting a handgun at the Lincoln. Stephanie Alfano, Oldaker's wife, also testified that the passenger in the back of the Tahoe shot several times at the Lincoln.

After the two occupants of the Tahoe shot several times at the Lincoln, the Tahoe made a U-turn so it was facing eastbound on Grand Avenue. After stopping, the driver fired several shots at the Lincoln. The Tahoe then sped off eastbound on Grand Avenue. The Lincoln made a U-turn in an apparent attempt to follow the Tahoe, but it went only a short distance before veering off the road and coming to a stop on the grass in front of a car dealership.

Kevin Lafin, an Elmhurst police officer, responding to a radio dispatch regarding the shooting, saw a Tahoe matching the suspects' vehicle on the Eisenhower Expressway. He observed three occupants in the Tahoe and followed it. He followed the Tahoe into an alley in Bellwood where it stopped in the 600 block of Marshall Avenue. Thereafter, three occupants exited and ran away. A nearby resident also saw three occupants exit the vehicle.

Officer Ackerman of the Broadview police department, along with his police dog, arrived at the scene where the Tahoe stopped. In the 600 block of Frederick Avenue in Bellwood, the dog began barking at a heavy clump of bushes. When he shined his flashlight into the bushes, Officer Ackerman observed two individuals hiding. Officer Ackerman described both as "profusely sweating, very nervous, and [looking] like they just finished running a marathon." The two individuals were defendant and Raul Ceja, both of whom were arrested.

A search of the area between where the Tahoe stopped and where defendant and Ceja were found revealed a Ruger 9-millimeter handgun in some bushes. After finding the Ruger, the police questioned defendant about the location of the second gun, and he directed them to a Smith & Wesson handgun, which was hidden in bushes near where the police found the Ruger. The police also found two discarded hooded sweatshirts in the same area they found the guns.

Following their arrests, defendant and Ceja were transported to

the detention facility at the Elmhurst police department. Michael Lullo, a detective with the Elmhurst police department, met with defendant and advised him of his *Miranda* rights. Lullo spoke to defendant in English, defendant spoke to him in English, and he believed defendant understood English. Defendant admitted to Lullo he was a member of the Maywood Latin Kings street gang.

Defendant also made several statements to Detective Raymond Bradford of the Elmhurst police department while in the detention facility. Also present was an assistant State's Attorney from Du Page County, Jeffrey Kendall. Defendant admitted that he had been in the Tahoe and had run from it after it stopped. He also admitted that he was the occupant in the rear seat during the shooting and that he had accidentally shot out the rear passenger window. Defendant also told Detective Bradford there were only two guns, not three, used in the shooting. When Detective Bradford suggested to defendant they were driving around looking to steal another vehicle, defendant responded, "We had guns with us. We don't take guns when we go out to steal cars." Defendant also said he knew one of the victims was the owner of the Lincoln and a member of a rival gang, the Imperial Gangsters. Defendant described the Lincoln as one involved in previous drive-by shootings in Maywood. Defendant also admitted that all three occupants of the Tahoe, including himself, fired shots at the Lincoln's occupants. When Detective Bradford described a drive-by shooting at Ceja's residence on July 24, 1998, defendant agreed that Ceja was upset and that may have been what motivated Ceja to shoot at the Lincoln's occupants.

The physical evidence included 9-millimeter shell casings and fired bullets recovered from the scene, the Tahoe, and the victims' bodies. The police also recovered a 9-millimeter ammunition box from the Tahoe with defendant's fingerprint on it. The bullets removed from the bodies of the victims were fired from the Smith & Wesson handgun found in the bushes near where defendant and Ceja were hiding. Defendant's prints were also found in several places on the Tahoe. The fingerprint expert testified that "no two individuals have the same fingerprints."

Also pertinent to this appeal are several statements made by defendant and Ceja while they were in the detention facility at the Elmhurst police department that were overheard via an electronic monitoring system. Each of the cells in the detention area has a two-way sound system. That system includes a speaker in each cell that is visible to the occupant. There is a panel in the control area that has toggle switches that allow the operator to activate the system in any given cell. When the system is activated, it emits a loud beep, or alert

tone, every 9 or 10 seconds, which is audible in each cell. Aside from the visible speaker and audible tone, there are no notices posted anywhere regarding the presence of the system or its capability for transmitting voices from the cell to the control room. The system is not operational at all times and is used when there is a concern for the detainee, an officer, or when the crime involved is serious.

Officer Jodi Bellis testified that on July 27, 1998, Ceja and defendant were held in two separate cells in the detention area. About 9:30 a.m., Bellis went into the detention area to tell defendant and Ceja to be quiet. She told defendant that she could hear what they were saying even when she was not in the room and that their conversations were being "monitored" at the front desk. She spoke in English but did not explain to defendant what she meant by the word "monitor."

Defendant and Ceja made several statements to each other while in the detention facility that were heard via the monitoring system. Because some of these statements were in Spanish, Officer Gonzalo Gomez, who understands both English and Spanish, was brought in to listen to and translate the conversations of defendant and Ceja. Gomez took notes, but no electronic recording was made.

Detective Bradford testified that while he was in the control room he heard Ceja say, "My parents sent my brother away," and defendant answered, "Yeah." Ceja further stated, "They're afraid they'll come after him. I hope the brothers don't get popped. They don't have any guns anymore," to which defendant said, "Yeah." Ceja also said, "The fat one, he was my sister's boyfriend. Boxer, he was from the jungle. He wasn't even banging anymore." Then both defendant and Ceja laughed.

According to Kendall, while he was listening he heard Ceja say, "They found the guns," to which defendant responded, "Yeah. Two. They showed me one." Ceja also said, "They found a lot of fingerprints in the truck. They got my prints. They got your prints. They got Capone's prints. They had a bunch they haven't told us about," to which defendant responded, "Yeah." Ceja also stated, "They say that guy is the guy that shot up our town."

Gomez testified that he heard one of the two say in Spanish, "Hey, they can hear what we say." Both Bradford and Kendall heard defendant say in English, "Hey, we're innocent." Defendant moved to suppress the statements made by himself and Ceja. The trial court denied the motion.

On November 20, 1998, while defendant was being held in the Du Page County jail, a search of his cell revealed two sheets of paper and one envelope with gang markings and hand-printed words on

them. The hand-printed statements included "When did our finger-prints get in the truck?" and "What story did you give your lawyer so I could give my lawyer the same one ***[?]" One side of the envelope also contained the words "Boxer Rots." When confronted with these items, defendant admitted to the jailer they were his and that he had drawn on them. Defendant was later ordered by the trial court to give a handprinting exemplar, which defendant refused to do. The trial court ruled that defendant's refusal to do so could be introduced at trial to show consciousness of guilt.

At trial, although the State did not refer to accountability in the indictment, it sought and received instructions on accountability. One instruction stated, "A person is legally responsible for the conduct of another person, when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." Further, the murder instruction for each victim provided, in pertinent part, that "the defendant *or one for whom he is legally responsible* performed the acts that caused the death." (Emphasis added.)

Defendant sought an instruction on conspiracy to commit murder, arguing that because of the evidence and the State's use of an accountability theory the jury could find him not guilty of first-degree murder but guilty of conspiracy to commit murder. The trial court refused to give defendant's proposed instruction. The jury found defendant guilty of first-degree murder as to both victims and sentenced defendant to natural life without parole on each count.

## DISCUSSION

Defendant contends that the trial court committed reversible error when it refused to give his proposed instruction on conspiracy to commit murder. The State responds that defendant's claim lacks merit because, first, conspiracy to commit murder is not a lesser included offense of first-degree murder based on the indictment, and, second, there was insufficient evidence to support such an instruction.

■ The proper standard of review is *de novo*. *People v. Landwer*, 166 Ill. 2d 475, 486 (1995). "Generally, a defendant may not be convicted of an offense for which he has not been charged." *People v. Hamilton*, 179 Ill. 2d 319, 323 (1997), citing *People v. Novak*, 163 Ill. 2d 93, 105 (1994). In an appropriate case, however, "a defendant is entitled to have the jury instructed on a less serious offense if that offense is included in the charged offense." *Hamilton*, 179 Ill. 2d at 323. The purpose of such an instruction is to provide " 'an important third

option to the jury which, believing that the defendant is guilty of something but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense.' " *Hamilton*, 179 Ill. 2d at 323-24, quoting *People v. Bryant*, 113 Ill. 2d 497, 502 (1986).

■ "In determining whether a particular offense is included in a charged offense, [the supreme court] has held that the proper approach is to examine both the charging instrument and the evidence *** at trial." *Hamilton*, 179 Ill. 2d at 324. "Under this charging instrument approach, an offense is identified as a lesser included offense if it is described by the charging instrument." *Hamilton*, 179 Ill. 2d at 324. It is not necessary for the charging instrument to expressly allege all the elements of the lesser offense, and to conclude a lesser crime is an included offense does not require that the lesser crime be a theoretical or practical necessity of the greater crime. *Hamilton*, 179 Ill. 2d at 325.

■ "Once a lesser included offense is identified, *** it does not automatically follow that the jury must be instructed on the lesser offense." *Hamilton*, 179 Ill. 2d at 324. "A defendant is entitled to a lesser included offense instruction only if an examination of the evidence reveals that it would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense." *Hamilton*, 179 Ill. 2d at 324.

■ In the present case, reading the indictment as drafted, the lesser offense of conspiracy to commit murder is not described therein. The indictment merely contains the bare bones allegation that with the requisite mental state defendant shot each of the victims. The statute defining conspiracy states:

"A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." 720 ILCS 5/8—2(a) (West 1998).

There are no allegations related to conspiracy in the indictment as alleged. Reliance on a strict charging instrument analysis in this case would preclude any instruction for conspiracy regardless of the evidence adduced at trial.

This case is unique, however, because the State, while not expressly charging first-degree murder by accountability, sought and received an instruction that included as an option first-degree murder under a theory of accountability. Additionally, it sought and received a separate instruction defining accountability. Therefore, the jury could

find defendant guilty either because it concluded he actually fired the lethal shots or because he was accountable for someone else doing so. By taking this approach, the State effectively modified the indictment to broaden it from its original offense of first-degree murder to first-degree murder under a theory of accountability. Thus, in applying the charging instrument analysis in this unique context, it is entirely appropriate to read the theory of accountability into the charging instrument for purposes of determining whether conspiracy to commit murder is described by the charging instrument.

To do otherwise would be to allow the State to prevent defendant from seeking a lesser included offense by casting the indictment in bare bones terms. The State could then, as it did here, effectively enlarge the charge by instructing on a theory of accountability but preclude a defendant from instructing on a lesser included offense. Such a result runs counter to any sense of a fair trial.

■ Having said that, it remains to be decided whether conspiracy to commit murder is described by the charge of first-degree murder by accountability and, if so, whether the evidence would properly support a conspiracy instruction. Section 5—2(c) of the Criminal Code of 1961 (720 ILCS 5/5—2(c) (West 1998)) provides:
"A person is legally accountable for the conduct of another when:
* * *
(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

■ In our view, when the State sought to meet its burden by employing a theory of accountability, it prompted the inference that if a person, with the intent to promote the commission of an offense, aids in its commission, then that person also intends that the offense be committed and agrees to its commission. Obviously, the requirement that "[n]o person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator" (720 ILCS 5/8—2 (West 1998)) is met by the State's allegation that the victims were shot with a handgun. Thus, a charge of murder amplified by an accountability instruction implicitly describes the offense of conspiracy. While it is true that the indictment in this case, combined with the accountability instruction, does not specifically allege that defendant intended that a murder be committed or that he agreed with another to its commission, under the charging instrument approach, to warrant a lesser included offense instruction "it is not necessary for the charging instrument to expressly allege all the ele-

ments of the lesser offense" (*Hamilton,* 179 Ill. 2d at 325). The supreme court "has readily found necessary statutory elements to be 'implicitly' contained in a charging instrument." *Hamilton,* 179 Ill. 2d at 325. "To conclude that a lesser crime is an included offense, it need not be a theoretical or practical necessity of the greater crime." *Hamilton,* 179 Ill. 2d at 325. Therefore, if accountability is charged (as it was in this case via the instructional modification of the indictment), then the charge describes the offense of conspiracy. Consequently, defendant would be entitled to an instruction on conspiracy to commit murder if an examination of the evidence reveals that it would permit a jury rationally to find defendant guilty of conspiracy yet acquit him of murder by accountability.

While the supreme court has said that this evidentiary requirement may be met if the conclusion as to the lesser offense may be inferred fairly from the evidence (*Novak,* 163 Ill. 2d at 108) and that the amount of evidence necessary to meet the requirement, that is, to prove the lesser offense rather than the greater, has been described as any, some, slight, or very slight (*Novak,* 163 Ill. 2d at 108-09), the supreme court has also stated that the evidence presented in a particular case might rationally preclude the use of an instruction on a lesser included offense (*People v. Bryant,* 113 Ill. 2d 497, 507 (1986); *People v. Mitchell,* 105 Ill. 2d 1, 14 (1984)). Although *Bryant* and *Mitchell* predate the supreme court's adoption of the charging instrument approach for determining whether an instruction on a lesser included offense should be given, *Bryant* utilized that approach and was cited as such in *Novak.* See *Novak,* 163 Ill. 2d at 107. Further, an earlier decision of this court also applied the language of *Mitchell* to hold that the failure to give a lesser included offense instruction did not require a retrial where "no jury could have concluded on [the] record" that the lesser offense was an appropriate verdict rather than the greater offense. *People v. Velarde,* 137 Ill. App. 3d 492, 497 (2d Dist. 1985).

Several decisions from other Illinois appellate court districts have gone one step further and applied a harmless error analysis to the failure to give a lesser included offense instruction. See, *e.g., People v. Taylor,* 233 Ill. App. 3d 461, 465 (5th Dist. 1992); *People v. McClellan,* 232 Ill. App. 3d 990, 1008 (1st Dist. 1992); *People v. Valdez,* 230 Ill. App. 3d 975, 986 (1st Dist. 1992). While these latter decisions predate *Novak* and arguably find no support for their harmless error analysis in any supreme court decision, they are consistent with the analytical approach that finds no error when the evidence rationally precludes the use of a lesser included offense instruction. Furthermore, the "rational preclusion" approach is analytically very similar to the supreme court's statement in *Novak* that a lesser included offense

instruction should be given only when the evidence would permit a jury rationally to find the defendant guilty of the lesser offense and not guilty of the greater. *Novak*, 163 Ill. 2d at 108. Put another way, if the evidence would not permit a jury rationally to find the defendant guilty of the lesser included offense, then the instruction should not be given whether the court bases the conclusion on "rational preclusion" or the language of *Novak*.

■ In the present case, there was some evidence that defendant conspired with Ceja to shoot the victims. Evidence to support such a conclusion is that defendant knew Ceja, defendant and Ceja were members of the same gang, one of the victims was in a rival gang, the Lincoln had been used in prior drive-by shootings in defendant's gang's territory, defendant knew Ceja was upset about the drive-by shooting of his home two days earlier, and defendant accompanied Ceja during the shooting. There was also an act in furtherance, namely, the shooting of the victims.

On the other hand, there was strong evidence that defendant took an active role in the shootings either by his direct participation or by his aiding and abetting Ceja or his agreeing or attempting to aid Ceja. Notably, defendant admitted to the police that he shot at the victims. He was captured shortly after exiting the getaway vehicle and knew where one of the guns used in the shooting had been hidden. The physical evidence also established that defendant had handled a box of ammunition that was consistent with the type used in the shooting.

While this evidence creates a strong probability that the jury would have found him guilty of murder by either his direct participation or by accountability (which it did) and rejected the lesser included offense of conspiracy, it cannot be said that the jury rationally could not have rejected the evidence of the greater offenses and accepted the proof of the lesser. Nor can it be concluded that the evidence in this case rationally precluded the jury from finding defendant guilty of conspiracy. Put another way, the jury rationally could have believed that defendant agreed to the commission of a murder, but at the same time rejected the conclusion that defendant aided, abetted, or agreed or attempted to aid either of the other people in the vehicle in the planning or commission of an offense. So long as the jury rationally could have reached such a result, it was reversible error not to give the lesser included instruction on conspiracy to commit murder. Accordingly, we reverse defendant's conviction as to both charges of first-degree murder.

In doing so, we recognize that defendant may be retried. Therefore, we have considered the evidence and have determined that it was sufficient to allow a jury to conclude beyond a reasonable doubt that

defendant committed the offenses as charged. This conclusion is not binding on the trial court, however, and is intended only to protect defendant from the risk of double jeopardy. See *People v. York*, 312 Ill. App. 3d 434, 440 (2000). Also, as other issues raised by defendant are likely to arise again in any retrial, we will consider them here. See *In re Detention of Trevino*, 317 Ill. App. 3d 324, 335 (2000).

■ Defendant contends that the statements by Ceja while in the detention facility should be inadmissible as hearsay of a nontestifying codefendant. The State responds that the statements are an admissible exception because they are tacit admissions or admissions by the silence of defendant.

We initially note that the admission of Ceja's statements and defendant's lack of denials is not a violation of defendant's right to confrontation if the evidence in question meets the requirements of the tacit-admission rule. See *People v. Goswami*, 237 Ill. App. 3d 532, 536 (1992). When a statement that is incriminating in nature is made in the presence and hearing of an accused, and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of the defendant's agreement in its truth. *People v. Childrous*, 196 Ill. App. 3d 38, 53 (1990). Assent to the statement may be manifested by silence or by an evasive, equivocal, or unresponsive reply. *Childrous*, 196 Ill. App. 3d at 53. The necessary elements for admissibility are (1) the defendant heard the incriminating statement; (2) the defendant had an opportunity to reply and remained silent; and (3) the incriminating statement was such that the natural reaction of an innocent person would be to deny it. *Goswami*, 237 Ill. App. 3d at 536. Such statements need not be accusatory, however, so long as it is evident that the defendant is "being painted or portrayed as a participant in illegal and prohibited activity." *People v. Miller*, 128 Ill. App. 3d 574, 584 (1984). Under such circumstances, an innocent person would normally and naturally deny or correct such an impression. *Miller*, 128 Ill. App. 3d at 584.

In this case, defendant's reactions to Ceja's statements do not qualify as tacit admissions. First, defendant did not have an unencumbered choice to speak up and deny the statements. He was under arrest and in police custody. He had already been warned that anything he said could be used against him at trial. It can also be inferred that he believed the police could hear his conversation with Ceja because he and Ceja were shouting across the cell area, because one of the two stated "they" could hear what the two were saying, and because Officer Bellis testified she had told the two to be quiet because they could be heard in the control room. Knowing that anything he said

could be used against him and that the police could hear his conversation with Ceja, it cannot reasonably be expected that defendant would feel free to respond to Ceja's comments. The situation in which the statements were made in the presence of defendant in this case is so unique as to remove it from the ordinary tacit-admission case.

This conclusion is supported by *People v. Bennett*, 3 Ill. 2d 357 (1954). The supreme court in *Bennett* stated that admissions by silence should be received with great caution and only under the proper conditions. *Bennett*, 3 Ill. 2d at 361. When statements are made in the presence of a defendant who is in no position to deny them, or if his silence is of such character that it does not justify the inference that he should have spoken, or if in any way he is restrained from speaking by either fear, doubt of his rights, instructions given by his attorney, or a reasonable belief it would be better or safer to keep silent, then standing silent does not amount to an admission. *Bennett*, 3 Ill. 2d at 361. We believe the circumstances surrounding defendant's reaction to Ceja's statements are controlled by *Bennett* and that defendant should not be held to an admission.

Second, some of the statements Ceja made were not the type that an innocent person would normally and naturally deny or correct. The statements, "My parents sent my brother away," and "The fat one, he was my sister's boy friend. Boxer, he was from the jungle. He wasn't even banging anymore," were not statements that painted or portrayed defendant as a participant in an illegal or prohibited activity. Rather, they were comments about the case. They were not the types of statements about which a defendant's lack of denial should be considered as an admission of guilt. Consequently, the statements and defendant's reactions thereto should not be admitted on retrial.

Because all of the statements are inadmissible hearsay of a codefendant and do not meet the requirements of the tacit-admission rule, we hold that they should not be admitted upon retrial. Having so ruled, we need not consider the issue of whether defendant consented to having the conversation electronically monitored.

■ Defendant next contends that the trial court erred in admitting his refusal to provide handprinting exemplars as evidence of consciousness of guilt. Specifically, defendant argues that, because handprinting analysis is not generally accepted in the relevant scientific community, had his trial counsel objected to the admission of handprinting analysis the trial court would have ruled it inadmissible and would not have ordered him to submit handprinting exemplars, thereby rendering his refusal of no consequence. Considering defendant's admission that the papers and envelope were his and that he drew on them, we do not see a compelling need for the State to pursue evidence of a handprinting

match, but if this issue were to arise at retrial, the trial court would need to conduct a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to ascertain whether handprinting comparison evidence is generally accepted in the relevant scientific community. See *People v. Davis*, 304 Ill. App. 3d 427, 435 (1999).

If the trial court were to rule handprinting analysis inadmissible under *Frye*, then, of course, defendant could not be ordered to submit an exemplar. If the trial court were to rule that handprinting analysis meets the *Frye* test, then defendant could be ordered to submit an exemplar and he would either have to comply or have his refusal admitted as consciousness of guilt. See *People v. McGee*, 245 Ill. App. 3d 703, 711 (1993); *People v. Roberts*, 115 Ill. App. 3d 384, 387 (1983).

■ Finally, we decide whether any of the following comments by the prosecutor during closing argument denied defendant a fair trial. Defendant's contentions are that (1) the prosecutor made a statement based on facts not in the record when he mistakenly told the jury that Kevin Oldaker said "that's the defendant" when shown a picture of the Tahoe; (2) the prosecutor, when referring to defendant's fingerprints being on the ammunition box, stated that "with fingerprints *** you can say to the exclusion of everyone else on earth it was that person," when no one testified to that statement at trial; (3) the prosecutor improperly bolstered the credibility of Detective Bradford and commented on a fact not in evidence when he referred to Bradford as a "veteran detective with a sterling record" and said of Bradford "[T]hey don't make [them] any better than Ray Bradford, they truly don't"; and he improperly bolstered the credibility of Kendall when he said he was a "career prosecutor" who is "out here protecting our rights, protecting the rights of people like Rick Sanchez *** and Alfredo Garcia"; (4) the prosecutor improperly commented that defendant knew the name of one of the victims when the evidence did not show that; and (5) the prosecutor argued that the State's witnesses who testified defendant made certain statements should be believed because the court had previously ruled the statements admissible.

Prosecutors are afforded wide latitude in closing argument and may argue facts and reasonable inferences drawn from the evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). Prosecutorial comments that are invited and not prejudicial do not constitute error. *People v. Williams*, 147 Ill. 2d 173, 232 (1991). In reviewing a challenge to remarks made by the State during closing argument, the comments must be considered in the context of the entire closing argument of the parties. *Williams*, 192 Ill. 2d at 573. Even if prosecutorial comment exceeds the bounds of proper argument, the verdict must

not be disturbed unless the remark caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *Williams*, 192 Ill. 2d at 573. Errors in the closing argument must result in prejudice so substantial that the result would have been different absent the complained-of remark. *Williams*, 192 Ill. 2d at 573. Further, reversal and remand are generally unnecessary where the trial court sustains a defense objection, thereby curing the potential for improper influences from the comment, especially where the jury is instructed that closing arguments are not to be considered evidence. *People v. Emerson*, 189 Ill. 2d 436, 488 (2000). Finally, the regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Byron*, 164 Ill. 2d 279, 295 (1995).

Here, the first objected-to comment is characterized by the State as an obvious misstatement by the prosecutor. There is clearly no evidence to support the prosecutor's statement that Oldaker said "[T]hat's the defendant" when shown a picture of the Tahoe. Such a misstatement by the prosecutor was improper and should not be made in a retrial absent evidence to that effect.

The second complained-of comment about the fingerprints was not improper, as the State's expert, Sergeant Robert Wojcik, testified that "no two individuals have the same fingerprints." The State's characterization that a fingerprint match excludes all others but the matched person is a fair use of Wojcik's testimony. At most it was simple hyperbole and not inappropriate. Moreover, any error was not substantial enough to have affected defendant's right to a fair trial.

The third issue is the prosecutor's bolstering of Bradford's and Kendall's credibility and his reference to a fact not in evidence when he described Bradford as having a "sterling record." We note that defendant, in his closing, attacked the credibility of these two witnesses. While the State may reply to comments made by defense counsel (*People v. Hudson*, 157 Ill. 2d 401, 445-46 (1993)), the prosecutor cannot interject his personal views and improperly bolster a witness's credibility (*People v. Rogers*, 172 Ill. App. 3d 471, 476-77 (1988)), nor can he make comments based on matters not in evidence (*People v. Roman*, 323 Ill. App. 3d 988, 999 (2001)). There is no evidence that Bradford had a sterling record. Thus, error occurred here when the prosecutor made such a reference. The prosecutor also erred in saying that they do not make them like Bradford anymore, as that was his unsubstantiated personal view.

We find no error, however, in the prosecutor's remark that Kendall was a "career prosecutor," as the evidence shows Kendall had been an assistant State's Attorney for many years. The comment was a fair characterization of the evidence and a fair response to an attack on Kendall's credibility. The same is true for the comment about Kendall protecting the rights of the victims and the public, as that is a fair description of one of Kendall's duties as a prosecutor.

Defendant's fourth complaint is that the State improperly argued that defendant knew the name of one of the victims. This was improper, as the evidence did not support such a comment. While the conversation between defendant and Ceja arguably supported such an inference, we have ruled the conversation inadmissible.

The final contention of defendant, that the prosecutor improperly mentioned the court had earlier ruled that certain statements of defendant were admissible, is conceded as error by the State. Accordingly, it should not be repeated in a retrial.

## CONCLUSION

For the foregoing reasons, we reverse defendant's convictions on counts I and II and remand the cause for a new trial on both counts.

Reversed and remanded.

HUTCHINSON, P.J., and BOWMAN, J., concur.