THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RENE SOTO, Defendant-Appellant.

Second District   No. 2—01—0119

Opinion filed September 2, 2003.

G. Joseph Weller and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Rene Soto, was convicted of two counts of first-degree

murder (720 ILCS 5/5—1 (West 1996)) and was sentenced to natural life imprisonment without parole on each count. This court reversed defendant's conviction and remanded the cause for a new trial on both counts. See *People v. Soto*, 336 Ill. App. 3d 238 (2002). Our supreme court denied the State's petition for leave to appeal but, under its supervisory authority, directed this court to vacate our opinion and reconsider our judgment in light of *People v. Ceja*, 204 Ill. 2d 332 (2003). See *People v. Soto*, 204 Ill. 2d 679 (2003). We now vacate our prior opinion pursuant to that order and file this opinion in its stead.

Defendant raises the following issues in this appeal: (1) whether the trial court erred in ruling that he consented to have his conversation with a codefendant at a detention facility electronically monitored; (2) whether he was denied his confrontation rights under the state and federal constitutions by the admission of his codefendant's statement made at the detention facility; (3) whether the trial court erred in admitting defendant's refusal to provide handprinting exemplars; (4) whether the prosecutor made unfairly prejudicial misrepresentations and improper comments during closing argument; and (5) whether the trial court erred in refusing to instruct the jury on the offense of conspiracy to commit murder as a lesser included offense of murder by accountability.

After reconsidering our judgment in light of *Ceja*, we now conclude that it was not reversible error for the trial court to have refused to instruct the jury on the offense of conspiracy to commit murder as a lesser included offense of murder by accountability. We also consider the other errors identified in our earlier opinion to be harmless. Therefore, we affirm the judgment of the circuit court of Du Page County.

## FACTS

Defendant and a codefendant, Raul Ceja, who was tried separately, were indicted for the shooting deaths of Richard Sanchez and Alfredo Garcia. The charges were based on a July 26, 1998, incident in which the victims, who were in a Lincoln Continental, were fatally shot by occupants of a Chevrolet Tahoe at the intersection of Oak Lawn and Grand Avenues in Elmhurst. The indictment against defendant contained five counts as to each victim. All 10 counts were premised on the same factual allegation that defendant "shot [the victim] with a handgun" combined with the operative language from the first-degree murder statute.

The evidence at trial established the following. On July 26, 1998, at about 9:25 p.m., Kevin Oldaker and his wife were stopped for a red light at the corner of Grand and Oak Lawn Avenues in Elmhurst.

There are four westbound lanes at that point of Grand Avenue with two lanes going straight and an inside left-turn lane and an outside right-turn lane. Oldaker's vehicle was in the right lane of the two through lanes. As they were waiting for the light to turn green, there was a Lincoln Continental sitting in the left lane of the through lanes next to the Oldaker vehicle. There were two male occupants in the front seat of the Lincoln.

As the light turned green, a Chevrolet Tahoe pulled into the westbound left-turn lane next to the Lincoln. At that point, Oldaker heard glass breaking and gunshots. He observed the front passenger halfway out the front door of the Tahoe shooting a handgun at the Lincoln. There was also a passenger in the rear seat of the Tahoe with his hand sticking out of the rear passenger window shooting a handgun at the Lincoln. Stephanie Alfano, Oldaker's wife, also testified that the passenger in the back of the Tahoe shot several times at the Lincoln.

After the two occupants of the Tahoe shot several times at the Lincoln, the Tahoe made a U-turn so it was facing eastbound on Grand Avenue. After stopping, the driver fired several shots at the Lincoln. The Tahoe then sped off eastbound on Grand Avenue. The Lincoln made a U-turn in an apparent attempt to follow the Tahoe, but it went only a short distance before veering off the road and coming to a stop on the grass in front of a car dealership.

Kevin Lafin, an Elmhurst police officer, responding to a radio dispatch regarding the shooting, saw a Tahoe matching the suspects' vehicle on the Eisenhower Expressway. He observed three occupants in the Tahoe and followed it. He followed the Tahoe into an alley in Bellwood, where it stopped in the 600 block of Marshall Avenue. Thereafter, three occupants exited and ran away. A nearby resident also saw three occupants exit the vehicle.

Officer Ackerman of the Broadview police department, along with his police dog, arrived at the scene where the Tahoe stopped. In the 600 block of Frederick Avenue in Bellwood, the dog began barking at a heavy clump of bushes. When he shined his flashlight into the bushes, Officer Ackerman observed two individuals hiding. Officer Ackerman described both as "profusely sweating, very nervous, and [looking] like they just finished running a marathon." The two individuals were defendant and Raul Ceja, both of whom were arrested.

A search of the area between where the Tahoe stopped and defendant and Ceja were found revealed a Ruger 9-millimeter handgun in some bushes. After finding the Ruger, the police questioned defendant about the location of the second gun, and he directed them to a Smith & Wesson handgun, which was hidden in bushes near where the police found the Ruger. The police also found two discarded hooded sweatshirts in the same area they found the guns.

Following their arrest, defendant and Ceja were transported to the detention facility at the Elmhurst police department. Michael Lullo, a detective with the Elmhurst police department, met with defendant and advised him of his *Miranda* rights. Lullo spoke to defendant in English, defendant spoke to him in English, and he believed defendant understood English. Defendant admitted to Lullo he was a member of the Maywood Latin Kings street gang.

Defendant also made several statements to Detective Raymond Bradford of the Elmhurst police department while in the detention facility. Also present was an assistant State's Attorney from Du Page County, Jeffrey Kendall. Defendant admitted that he had been in the Tahoe and had run from it after it stopped. He also admitted that he was the occupant in the rear seat during the shooting and that he had accidently shot out the rear passenger window. Defendant also told Detective Bradford there were only two guns, not three, used in the shooting. When Detective Bradford suggested to defendant they were driving around looking to steal another vehicle, defendant responded, "We had guns with us. We don't take guns when we go out to steal cars." Defendant also said he knew one of the victims was the owner of the Lincoln and a member of a rival gang, the Imperial Gangsters. Defendant described the Lincoln as one involved in previous drive-by shootings in Maywood. Defendant also admitted that all three occupants of the Tahoe, including himself, fired shots at the Lincoln's occupants. When Detective Bradford described a drive-by shooting at Ceja's residence on July 24, 1998, defendant agreed that Ceja was upset and that may have been what motivated Ceja to shoot at the Lincoln's occupants.

The physical evidence included 9-millimeter shell casings and fired bullets recovered from the scene, the Tahoe, and the victims' bodies. The police also recovered a 9-millimeter ammunition box from the Tahoe with defendant's fingerprint on it. The bullets removed from the bodies of the victims were fired from the Smith & Wesson handgun found in the bushes near where defendant and Ceja were hiding. Defendant's prints were also found in several places on the Tahoe. The fingerprint expert testified that "no two individuals have the same fingerprints."

Also pertinent to this appeal are several statements made by defendant and Ceja while they were in the detention facility at the Elmhurst police department that were overheard via an electronic monitoring system. Each of the cells in the detention area has a two-way sound system. That system includes a speaker in each cell that is visible to the occupant. There is a panel in the control area that has toggle switches that allow the operator to activate the system in any

given cell. When the system is activated it emits a loud beep, or alert tone, every 9 or 10 seconds, which is audible in each cell. Aside from the visible speaker and audible tone, there are no notices posted anywhere regarding the presence of the system or its capability for transmitting voices from the cell to the control room. The system is not operational at all times and is used when there is a concern for the detainee, an officer, or when the crime involved is serious.

Officer Jodi Bellis testified that on July 27, 1998, Ceja and defendant were held in two separate cells in the detention area. At about 9:30 a.m., Bellis went into the detention area to tell defendant and Ceja to be quiet. She told defendant that she could hear what they were saying even when she was not in the room and that their conversations were being "monitored" at the front desk. She spoke in English but did not explain to defendant what she meant by the word "monitor."

Defendant and Ceja made several statements to each other while in the detention facility that were heard via the monitoring system. Because some of these statements were in Spanish, Officer Gonzalo Gomez, who understands both English and Spanish, was brought in to listen to and translate the conversations of defendant and Ceja. Gomez took notes, but no electronic recording was made.

Detective Bradford testified that while he was in the control room he heard Ceja say, "My parents sent my brother away," and defendant answered, "Yeah." Ceja further stated, "They're afraid they'll come after him. I hope the brothers don't get popped. They don't have any guns anymore," to which defendant said, "Yeah." Ceja also said, "The fat one, he was my sister's boyfriend. Boxer, he was from the jungle. He wasn't even banging anymore." Then both defendant and Ceja laughed.

According to Kendall, while he was listening he heard Ceja say, "They found the guns," to which defendant responded, "Yeah. Two. They showed me one." Ceja also said, "They found a lot of fingerprints in the truck. They got my prints. They got your prints. They got Capone's prints. They had a bunch they haven't told us about," to which defendant responded, "Yeah." Ceja also stated, "They say that guy is the guy that shot up our town."

Gomez testified that he heard one of the two say in Spanish, "Hey, they can hear what we say." Both Bradford and Kendall heard defendant say in English, "Hey, we're innocent." Defendant moved to suppress the statements made by himself and Ceja. The trial court denied the motion.

On November 20, 1998, while defendant was being held in the Du Page County jail, a search of his cell revealed two sheets of paper

and one envelope with gang markings and hand-printed words on them. The hand-printed statements included, "When did our fingerprints get in the truck?" and "What story did you give your lawyer so I could give my lawyer the same one ***[?]" One side of the envelope also contained the words "Boxer Rots." When confronted with these items, defendant admitted to the jailer they were his and that he had drawn on them. Defendant was later ordered by the trial court to give a handprinting exemplar, which defendant refused to do. The trial court ruled that defendant's refusal to do so could be introduced at trial to show consciousness of guilt.

At trial, although the State did not refer to accountability in the indictment, it sought and received instructions on accountability. One instruction stated, "A person is legally responsible for the conduct of another person, when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." Further, the murder instruction for each victim provided, in pertinent part, that "the defendant *or one for whom he is legally responsible* performed the acts that caused the death." (Emphasis added.)

Defendant sought an instruction on conspiracy to commit murder, arguing that because of the evidence and the State's use of an accountability theory the jury could find him not guilty of first-degree murder but guilty of conspiracy to commit murder. The trial court refused to give defendant's proposed instruction. The jury found defendant guilty of first-degree murder as to both victims and sentenced defendant to natural life without parole on each count.

## DISCUSSION

■ Defendant contends that the trial court committed reversible error when it refused to give his proposed instruction on conspiracy to commit murder. This precise issue was raised by the defendant in *Ceja* and rejected by our supreme court. *Ceja*, 204 Ill. 2d at 358-62. For the reasons set forth in *Ceja*, we reject defendant's contention and hold it was not error for the trial court to refuse to give the lesser included offense instruction on conspiracy.

■ We turn next to the remaining issues in this case. Defendant raised two issues in his appeal pertaining to statements he and Ceja made while in the detention facility. As to the issue of whether those statements were recorded in violation of the eavesdropping statutes (720 ILCS 5/14—1 through 14—9 (West 1998)), we follow the holding in *Ceja* that Ceja and defendant were aware their conversations were

being monitored and, therefore, consented for purposes of the statutes. See *Ceja*, 204 Ill. 2d at 346-51.

Next, we address whether the statements by Ceja while in the detention facility should be inadmissible as hearsay of a nontestifying codefendant. The State responds that the statements are an admissible exception because they are tacit admissions, or admissions by the silence of defendant.

■ ■ We initially note that admission of Ceja's statements and evidence of defendant's lack of denials is not a violation of defendant's right to confrontation if the evidence in question meets the requirements of the tacit-admission rule. See *People v. Goswami*, 237 Ill. App. 3d 532, 536 (1992). When a statement that is incriminating in nature is made in the presence and hearing of an accused and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of the defendant's agreement in its truth. *People v. Childrous*, 196 Ill. App. 3d 38, 53 (1990). Assent to the statement may be manifested by silence or by an evasive, equivocal, or unresponsive reply. *Childrous*, 196 Ill. App. 3d at 53. The necessary elements for admissibility are: (1) the defendant heard the incriminating statement; (2) the defendant had an opportunity to reply and remained silent; and (3) the incriminating statement was such that the natural reaction of an innocent person would be to deny it. *Goswami*, 237 Ill. App. 3d at 536. Such statements need not be accusatory, however, so long as it is evident that the defendant is "being painted or portrayed as a participant in illegal and prohibited activity." *People v. Miller*, 128 Ill. App. 3d 574, 584 (1984). Under such circumstances, an innocent person would normally and naturally deny or correct such an impression. *Miller*, 128 Ill. App. 3d at 584.

■ In this case, defendant's reactions to Ceja's statements do not qualify as tacit admissions. First, defendant did not have an unencumbered choice to speak up and deny the statements. He was under arrest and in police custody. He had already been warned that anything he said could be used against him at trial. It can also be inferred that he believed the police could hear his conversation with Ceja because he and Ceja were shouting across the cell area, because one of the two stated "they" could hear what the two were saying, and Officer Bellis testified she had told the two to be quiet because they could be heard in the control room. Knowing that anything he said could be used against him and that the police could hear his conversation with Ceja, it cannot reasonably be expected that defendant would feel free to respond to Ceja's comments. The situation in which the statements were made in the presence of defendant in this case is so unique as to remove it from the ordinary tacit-admission case.

This conclusion is supported by *People v. Bennett*, 3 Ill. 2d 357 (1954). The supreme court in *Bennett* stated that admissions by silence should be received with great caution and only under the proper conditions. *Bennett*, 3 Ill. 2d at 361. When statements are made in the presence of a defendant who is in no position to deny them, or if his silence is of such character that it does not justify the inference that he should have spoken, or if in any way he is restrained from speaking by either fear, doubt of his rights, instructions given by his attorney, or a reasonable belief it would be better or safer to keep silent, then standing silent does not amount to an admission. *Bennett*, 3 Ill. 2d at 361. We believe the circumstances surrounding defendant's reaction to Ceja's statements are controlled by *Bennett* and that defendant should not be held to an admission.

Second, some of the statements Ceja made were not the type that an innocent person would normally and naturally deny or correct. The statements, "My parents sent my brother away," and "The fat one, he was my sister's boy friend. Boxer, he was from the jungle. He wasn't even banging anymore," were not statements that painted or portrayed defendant as a participant in an illegal or prohibited activity. Rather, they were comments about the case. They were not the type of statements about which a defendant's lack of denial should be considered as an admission of guilt. Thus, the statements and defendant's reactions thereto do not qualify as tacit admissions.

■ Because all of the statements are inadmissible hearsay of a codefendant and do not meet the requirements of the tacit-admission rule, we hold that they should not have been admitted. We do not, however, consider this error to be reversible. Errors in the admission of hearsay evidence are harmless when properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant. *People v. Sample*, 326 Ill. App. 3d 914, 924 (2001). Admission of hearsay is harmless if there is no reasonable probability the verdict would have been different had the hearsay been excluded. *Sample*, 326 Ill. App. 3d at 924-25.

In this case, the other evidence independent of Ceja's statements precludes any reasonable possibility of a different verdict. Defendant was found hiding near where the vehicle used in the shooting had been abandoned. He also directed the police to where the Smith & Wesson handgun, one of the weapons used in the shooting, was located. Defendant also made several incriminating statements to the police. He told Detective Bradford that he had been in the Tahoe at the time of the shooting and had run from it after it stopped. He also admitted he was the occupant in the rear of the Tahoe at the time of the shooting and that he had accidently shot out the rear passenger window. He

further admitted that all three occupants of the Tahoe, including himself, fired shots at the victims' vehicle. There was also physical evidence implicating defendant. The bullets removed from the victims' bodies were fired from the Smith & Wesson handgun to which defendant had directed the police. Defendant's fingerprints were also found in several places on the Tahoe. In light of this overwhelming evidence of defendant's guilt, we hold the error in admitting Ceja's statements was harmless.

The next issue to be addressed is defendant's contention that the trial court erred in admitting his refusal to provide handprinting exemplars as evidence of consciousness of guilt. Defendant admits he waived this issue by failing to raise it at trial but contends that we should consider the issue under the plain error rule. Alternatively, he argues his trial counsel was ineffective in failing to object to the State's request for handprinting exemplars which would have precluded his refusal to provide the exemplars.

■ Supreme Court Rule 615(a) provides a limited exception to the waiver rule and allows a reviewing court to consider plain errors affecting substantial rights that were not properly preserved in the trial court. 134 Ill. 2d R. 615(a). A court will consider a trial error under the plain error exception where the evidence in the case is closely balanced or where the error is so fundamental and of such a magnitude as to deny the defendant a fair trial. *People v. Hunter*, 331 Ill. App. 3d 1017, 1027 (2002).

■ As we have already explained, the evidence in this case is not closely balanced. Nor can we say any error in admitting defendant's refusal to submit handprinting exemplars was the type that denied him a fair trial. This was a small part of the case on a minor point which was not mentioned during closing argument. It cannot be said that any error would be fundamental or of significant magnitude. No plain error occurred in this regard; thus, the issue is waived.

■ As for the ineffective assistance of counsel issue, defendant must show that his attorney's performance fell below an objective standard of reasonableness and that the attorney's deficient performance prejudiced defendant. See *Ceja*, 204 Ill. 2d at 358. A defendant must satisfy both prongs of this test, and failure to establish either is fatal to his claim. *Ceja*, 204 Ill. 2d at 358. Here, defendant failed to satisfy either prong.

For a defendant to prevail on the first prong, he must show his counsel's performance was "so seriously deficient" that it fell below an objective standard of reasonableness. *People v. Metcalfe*, 202 Ill. 2d 544, 561 (2002). In order to show prejudice, a defendant must show that there is a reasonable probability that, but for counsel's errors,

the result of the proceeding would have been different. *Metcalfe*, 202 Ill. 2d at 562.

■ Here, in view of defendant's willingness to admit that the writings were his, we cannot say that his trial counsel's failure to object to a request for handprinting exemplars was so seriously deficient as to fall below an objective standard of reasonableness. Further, defendant cannot satisfy the prejudice prong of his ineffective assistance of counsel claim. Any error in not objecting to a request for handprinting exemplars would not have affected the outcome of the case in light of the overwhelming evidence. Defendant has failed to show ineffective assistance of counsel.

The final issue raised by defendant concerns comments by the prosecutor during closing argument. Defendant claims the following comments by the prosecutor during closing argument denied him a fair trial: (1) the prosecutor made a statement based on facts not in the record when he mistakenly told the jury that Kevin Oldaker said "that's the defendant" when shown a picture of the Tahoe; (2) the prosecutor, when referring to defendant's fingerprints being on the ammunition box, stated that "with fingerprints *** you can say to the exclusion of everyone else on earth it was that person," when no one testified as such at trial; (3) the prosecutor improperly bolstered the credibility of Detective Bradford and commented on a fact not in evidence when he referred to Bradford as a "veteran detective with a sterling record," when there was no evidence regarding Bradford's record, and said of Bradford "they don't make [them] any better than Ray Bradford, they truly don't," and improperly bolstered the credibility of Kendall when he said he was a "career prosecutor" who is "out here protecting our rights, protecting the rights of people like Ricky Sanchez *** and Alfredo Garcia"; (4) the prosecutor improperly commented that defendant knew the name of one of the victims when the evidence did not show that; and (5) the prosecutor argued that the State's witnesses who testified defendant made certain statements should be believed because the court had previously ruled the statements admissible.

■ ■ Prosecutors are afforded wide latitude in closing argument and may argue facts and reasonable inferences drawn from the evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). Prosecutorial comments that are invited and not prejudicial do not constitute error. *People v. Williams*, 147 Ill. 2d 173, 232 (1991). In reviewing a challenge to remarks made by the State during closing argument, the comments must be considered in the context of the entire closing argument of the parties. *Williams*, 192 Ill. 2d at 573. Even if prosecutorial comment exceeds the bounds of proper argument, the verdict must

not be disturbed unless the remark caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *Williams*, 192 Ill. 2d at 573. To warrant relief, errors in closing argument must result in substantial prejudice such that the result would have been different absent the complained-of remark. *Williams*, 192 Ill. 2d at 573. Further, reversal and remand are generally unnecessary where the trial court sustains a defense objection, thereby curing the potential for improper influences from the comment, especially where the jury is instructed that closing arguments are not to be considered evidence. *People v. Emerson*, 189 Ill. 2d 436, 488 (2000). Finally, the regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Byron*, 164 Ill. 2d 279, 295 (1995).

■ Defendant here failed to object at trial or raise in a posttrial motion any objection to the first four allegedly improper comments; thus they are waived. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He argues, however, that he should be excused from the waiver rule because these allegedly improper comments constitute plain error. As we have already discussed, the evidence was overwhelming. Therefore, the closely-balanced-evidence prong of plain error does not apply.

Nor are the alleged errors of such magnitude as to have denied defendant a fair trial. Comments in closing argument must be considered in the context of the entire closing argument of both the State and the defendant. *Ceja*, 204 Ill. 2d at 357. Here, the objected-to comments are isolated remarks, only a brief portion of a rather extensive closing argument, and, in view of the extensive evidence in this case, they pertained to minor points. The claimed errors are not fundamental or of great magnitude; thus, defendant was not denied a fair trial. As plain error is inapplicable here, defendant has waived any challenge to the propriety of these comments.

Waiver aside, the challenged comments did not cause substantial prejudice to defendant and, thus, do not warrant a reversal. The first objected-to comment is characterized by the State as an obvious misstatement by the prosecutor. There is clearly no evidence to support the prosecutor's statement that Oldaker said "[T]hat's the defendant" when shown a picture of the Tahoe. This comment by the prosecutor, while not proper, does not constitute reversible error because it did not affect the outcome of the trial. Such a statement was an isolated remark and would have made little sense to the jury considering the tenuous connection between a person and a photograph of a vehicle.

The second complained-of comment about the fingerprints was not improper, as the State's expert, Sergeant Robert Wojcik, testified that "no two individuals have the same fingerprints." The State's characterization that a fingerprint match excludes all others but the matched person is a fair use of Sergeant Wojcik's testimony. At most, it was simple hyperbole and not inappropriate. Moreover, any error was not substantial enough to have affected defendant's right to a fair trial. See *Williams*, 192 Ill. 2d at 573.

The third point is the prosecutor's bolstering of Bradford's and Kendall's credibility and his reference to a fact not in evidence when he described Bradford as having a "sterling record." We note that defendant, in his closing, attacked the credibility of these two witnesses. While the State may reply to comments made by defense counsel (*People v. Hudson*, 157 Ill. 2d 401, 445-46 (1993)), the prosecutor cannot interject his personal views and improperly bolster a witness's credibility (*People v. Rogers*, 172 Ill. App. 3d 471, 476-77 (1988)), nor can he make comments based on matters not in evidence (*People v. Roman*, 323 Ill. App. 3d 988, 999 (2001)).

While it was not proper to state that Bradford had a sterling record because there was no evidence of that, it was an isolated remark on a minor point that did not substantially prejudice defendant. The same can be said for the prosecutor's unsubstantiated personal view that they do not make them like Bradford anymore.

We also do not find error in the prosecutor's remark that Kendall was a "career prosecutor," as the evidence shows that Kendall had been an assistant State's Attorney for many years. The comment was a fair characterization of the evidence and a fair response to an attack on Kendall's credibility. The same is true for the comment about Kendall protecting the rights of the victims and the public, as that was a fair description of one of Kendall's duties as a prosecutor.

Defendant's fourth complaint is that the State improperly argued that defendant knew the name of one of the victims. This was not error, as the conversation between defendant and Ceja in the detention facility supported such an inference.

Defendant alternatively argues that his trial counsel was ineffective for failing to object to the alleged improper comments. As we have noted earlier, an ineffective assistance of counsel claim can be disposed of on the ground that the defendant suffered no prejudice from the alleged error. *Metcalfe*, 202 Ill. 2d at 562. In order to show prejudice, a defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Metcalfe*, 202 Ill. 2d at 562. We reject defendant's ineffective assistance of counsel claim in this regard

because, in view of our discussion above, we cannot conclude that the outcome of the trial would have been different absent the challenged remarks.

■ Defendant's final contention regarding closing argument is that the prosecutor improperly mentioned that the trial court had earlier ruled that certain statements of defendant were admissible. Defense counsel objected to this comment, and the trial court sustained the objection. Any error was harmless in light of the overall evidence in the case and the amelioration via the sustained objection. See *Emerson*, 189 Ill. 2d at 488. Further, the trial court instructed the jurors that they were not to consider closing argument as evidence. See Illinois Pattern Jury Instructions, Criminal, No. 1.03 (4th ed. 2000); *Emerson*, 189 Ill. 2d at 488.

## CONCLUSION

For the foregoing reasons, we affirm defendant's convictions on counts I and II.

Affirmed.

HUTCHINSON, P.J., and BOWMAN, J., concur.